Eddie "Flame" GREGORY, Plaintiff,

v.

Joseph SCORCIA and Flame Gregory Enterprises, Ltd., Defendants.

No. 80 Civ. 1482(MP).

United States District Court, S. D. New York.

July 16, 1980.

Daniel J. Kornstein, New York City, for plaintiff.

Fried, Greenbaum, Scher & Schwartz, New York City, by Harvey J. Fried, Melvyn Schwartz, New York City, for defendants.

## DECISION

MILTON POLLACK, District Judge.

This case was heard at a Bench trial. Jurisdiction is posited on diversity of citizenship of the parties and the requisite amount in controversy.

In this action, plaintiff Eddie "Flame" Gregory, holder of the light-heavyweight crown of the World Boxing Association ("WBA"), seeks to have three management contracts he made with the defendants declared null and void and rescinded, and to have defendants enjoined from enforcing these contracts. Plaintiff claims that defendants have breached their contractual duties to him and that, moreover, the contracts violate the New York statutes and regulations governing manager-boxer relations.[1] Defendants deny that they have breached their duties to plaintiff and deny that the contracts are void under New York law.

For the reasons discussed hereafter, plaintiff is not entitled to the relief sought and his complaint will be dismissed.

*The management contracts in issue*

Plaintiff Gregory and defendant Joseph Scorcia first discussed the possibility of Scorcia's becoming Gregory's manager in the summer of 1976, plaintiff Gregory having apparently become unhappy with his manager of several years, Jack Singer. Scorcia, although not a full-time boxing manager, was licensed to manage by the New York State Athletic Commission, and had been managing boxers for about four years.

In early August 1976, Scorcia incorporated Flame Gregory Boxing Enterprises, Ltd. ("Enterprises") in New York; Enterprises is not licensed as a boxing manager in New York. On September 3, 1976, Gregory and Enterprises entered into a written contract ("the September 3 contract") that provided for Enterprises to act as Gregory's manager for four years commencing August 27, 1976. This contract was conditioned on Enterprises' obtaining a release from Singer, which it did on September 9, upon payment of $10,000 to Singer.

Under this contract, Gregory agreed to render his boxing services solely for Enterprises, in return for Enterprises' promise to exert its best efforts to secure remunerative boxing contests for Gregory. Gregory

---

1. The complaint also asserted claims for damages based on breach of contract, fraudulent inducement, and defamation. These claims were dismissed at the close of plaintiff's case for failure of proof.

was to receive 66⅔% of all fight purses, after deduction of expenses.

Pursuant to regulations promulgated by the New York State Athletic Commission which provide that a contract between manager and boxer is not valid for purposes of bouts held in New York "unless both parties appear at the same time before the commission and receive its approval [of the contract]", N.Y.C.R.R. § 205.5, on September 10, 1976, Gregory and Scorcia appeared at the Commission's offices. In compliance with another regulation providing that "Contracts between boxers and manager . . . shall be executed on printed forms approved by the commission," N.Y.C.R.R. § 206.1, Gregory and Scorcia executed a second contract on a form provided by the Commission ("the September 10 contract").

The basic terms of this contract were consistent with the September 3 contract in providing for a term of four years and for Gregory to receive 66⅔% of all fight purses after expenses. Unlike the September 3 contract however, the September 10 contract named both Scorcia individually and Enterprises (who were functionally equivalent anyway), as Gregory's manager and was signed by Scorcia with the title "Pres." The September 10 contract provided further that it did not go into effect until approved by the Commission and became "null and void if during its term either the Athlete or the Manager is not duly licensed by the said Commission." The Commission approved this contract on October 7, 1976.

On March 16, 1977, shortly after Gregory had won an important victory over Matt Franklin (now the holder of the WBC light-heavyweight title under the name Matthew Saad Muhammad), Gregory and Enterprises entered into a third management contract ("the March 16 contract"). Under this contract, Enterprises alone was to act as manager for Gregory for four years commencing August 27, 1980—that is, commencing upon the expiration of the September 3 contract. Except for the operative dates, the terms of this contract were virtually identical to the September 3 contract. Gregory received $4,000 outright and a $6,000 loan from Enterprises for signing this contract.

*The disputes between Gregory and Scorcia*

It appears that Gregory and Scorcia had periodic minor disputes from at least the latter part of 1977, and that by December 1979 Gregory had become generally and thoroughly dissatisfied with Scorcia. In particular, Gregory felt that Scorcia was not obtaining sufficiently profitable fights for him or accommodating him with suitably posh training quarters. No evidence was adduced, however, demonstrating any sound basis for these feelings or showing that Scorcia used other than his best efforts to obtain remunerative fights for Gregory and to advance him through the ranks.

In fact, Scorcia performed his tasks as manager (and Gregory his as boxer) ably enough so that by December 1979, Gregory was the number one ranked contender in the WBA. Under WBA custom, Gregory was therefore entitled to a mandatory title fight with the then-reigning champion, Marvin Johnson. Scorcia began negotiating with Bob Arum, the promoter who handles most WBA fights, for a title fight for Gregory.

Arum's original offer called for Gregory to receive $40,000 for the title challenge, and would have given Arum the option to promote the next three title defenses in the event that Gregory won. Scorcia presented this offer to Gregory, but assured the latter that they could get more money. This assurance proved well-founded, as Arum subsequently increased his offer to $60,000 for the title challenge, and to $130,000, $140,000, and $160,000, respectively for the three title defenses on which Arum would have the above-mentioned option.

Scorcia presented this proposed contract to Gregory, but Gregory declined to sign it. Gregory claims that he told Scorcia at this point that he was not signing any contract with options in it, but would only sign a one-fight contract, because he felt he could earn more money promoting his own fights after he became champion. Scorcia, on the other hand, claims that Gregory never mentioned options at this point—that he gave various ill-defined reasons for not signing,

including that he was just not ready and did not want to fight Johnson.

At any rate, faced with Gregory's avowed unwillingness to sign the contract as it had been negotiated, Scorcia obtained a ten day extension for finalizing the deal, until December 22. Laboring under the misapprehension that Gregory meant what he said—that he did not want to fight Johnson under any circumstances at that time—Scorcia had several mutual acquaintances of his and Gregory's phone Gregory and attempt to persuade him to sign the contract. Mr. Gregory again claims that these people called him to urge him to sign an option contract, and that he told them he was not signing any such contract. However, each of these people testified that there was no mention of the option problem during their conversations with Gregory: rather, Gregory intimated that it was his unhappiness with Scorcia and his desire to cast him off as manager that was at the root of his reluctance to sign.

On December 22, 1979, a meeting was held at the office of Howard Cerny, Gregory's new attorney, at which Scorcia was clearly informed of two things: that Gregory was not signing any contract with options in it, and that Cerny would handle the negotiations for the title fight because Gregory no longer considered Scorcia to be his manager. Although Scorcia was naturally incensed at this announcement, he remained in the office while Cerny called Arum's office and informed Arum that Gregory would only sign a one-fight contract. Scorcia, who thought this was a bad business decision, inasmuch as Arum's initial offer for a one-fight contract was only $20,000, gave no indication that he opposed a one-fight deal or would otherwise frustrate Gregory's will.

On December 27, Scorcia called Arum, and was told that no contract had been signed and that Arum's patience was wearing thin. Since under WBA rules, a number-one ranked contender who fails to make use of his right to a mandatory title fight is removed completely from the ratings, Scorcia became concerned that Gregory would lose his chance at a title shot unless he acted quickly. Accordingly, Scorcia tried to reach Gregory to forestall such a forfeiture, but was unable to reach him: Gregory could not be found at the gym he normally trained at, and his telephone had been cut off. Scorcia also left messages with Cerny's office, but his calls were not returned.

On December 31, Scorcia met with Arum, who stated that unless a contract was signed, he would arrange for Johnson to fight someone other than Gregory. In the face of this potentially devastating turn of events, Scorcia attempted to avoid a rupture with and to placate Arum by signing the $60,000 three-option contract which Gregory had said was unacceptable, but which, according to Scorcia, was the only offer Arum was willing to consider at that time. Scorcia then took this proposed contract, which required the signature of Gregory by January 2, 1980, and set off in search of Gregory. Again unable to find him, he left a note at Gregory's house asking the boxer to communicate with him before the January 2 deadline expired.

On January 2, Gregory called Scorcia and told him he would not sign the contract. Scorcia, whose main concern was still that Gregory not lose his number one ranking, called Arum and pleaded for more time. Arum then proposed an arrangement whereby Gregory would fight Johnson in September rather than March 1980, under the terms set forth in the three option contract, and would fight three tune-up fights in the interim at $5,000, $7,500, and $10,000 respectively. Arum told Scorcia that in order to protect Gregory's ranking Scorcia should inform the WBA that they had reached this agreement.

On January 4, at Arum's prompting, Scorcia sent a mailgram to the WBA reading as follows:

REGRET TO INFORM YOU THAT AL-THOUGH I HAD NEGOTIATED A VERY FAVORABLE CONTRACT WITH BOB ARUM ENTERPRISES FOR A TITLE FIGHT WITH MARVIN JOHNSON IN MARCH 1980 I HAVE BEEN INFORMED BY GREGORY

THAT HE WILL NOT SIGN FOR A TITLE FIGHT AT THIS TIME UNDER THE TERMS PROPOSED. MY CONTRACT WITH GREGORY IS REGISTERED WITH THE NEW YORK STATE ATHLETIC COMMISSION ACCORDINGLY GREGORY IS NOT AVAILABLE AT THIS TIME TO FIGHT JOHNSON BUT I HAVE SIGNED A CONTRACT WITH BOB ARUM ENTERPRISES FOR GREGORY TO FIGHT FOR THE TITLE IN SEPTEMBER

Scorcia called New Jersey State Athletic Commissioner Robert Lee to confirm that this mailgram would protect Gregory's ranking, and Commissioner Lee informed him it would.

On that same day, January 4, Gregory's attorney Howard Cerny, who apparently shared Scorcia's apprehensions about the possibility of Gregory losing his ranking, but who apparently was as unaware of Scorcia's activities as Scorcia was of Cerny's, also sent a mailgram to the WBA, as follows:

CONFIRMING TODAY'S TELEPHONE CONVERSATION STOP AS ATTORNEY FOR EDDIE GREGORY AND ON HIS BEHALF I INFORM YOU THAT EDDIE GREGORY IS READY WILLING ABLE AND AVAILABLE TO FIGHT MARVIN JOHNSON FOR THE WBA LIGHT--HEAVYWEIGHT TITLE BEFORE THE END OF FEBRUARY 1980.

The WBA, naturally puzzled at receiving these conflicting communiques, sent Cerny an inquiry on January 8, reading:

HAVE RECEIVED CABLE FROM PRESIDENT WBA STATING THAT HE HAS RECEIVED CABLE FROM MANAGER EDDIE GREGORY INFORMING THAT FIGHTER NOT AVAILABLE TO FIGHT JOHNSON STOP PLEASE CLARIFY URGENTLY STOP

Cerny immediately responded to this inquiry with the following message:

SHOCKED AT YOUR TELEGRAM STATING YOU HEARD EDDIE GREG-ORY NOT AVAILABLE TO FIGHT MARVIN JOHNSON STOP THIS IS NOT TRUE AND THERE IS ABSOLUTELY NO BASIS FOR SCORCIA TO HAVE MADE THIS STATEMENT STOP GREGORY DOES NOT RECOGNIZE SCORCIA AS HIS MANAGER AND SCORCIA HAS NO AUTHORITY TO SPEAK FOR GREGORY STOP WE REAFFIRM PRIOR TELEGRAM SENT YOU STOP GREGORY IS READY WILLING ABLE AND AVAILABLE TO FIGHT JOHNSON BEFORE END OF FEBRUARY 1980 PLEASE SEND US COPY OF CABLE YOU RECEIVED FROM PRESIDENT OF WBA STOP PLEASE ADVISE IF ANYTHING FURTHER REQUIRED ON GREGORYS PART TO PERFECT CHALLENGE WITH JOHNSON STOP MANY THANKS

On January 11, 1980, Arum, through Cerny, made Gregory a final offer for a one-fight contract at $25,000, which offer Arum was willing to keep open only until January 15. On January 15, Gregory signed a contract under these terms. Thereafter, without Gregory's knowledge, Arum asked Scorcia to sign the contract, which Scorcia did without objection.

On January 16, 1980, the New York State Athletic Commission held an informal hearing at Scorcia's request. At this hearing, Gregory's dissatisfaction at the amount of money Scorcia had made for him in the past was discussed, as was Gregory's feeling that Scorcia had tried to railroad him into signing an option contract. On January 29, 1980, the Commission wrote Gregory that

It is the determination of the New York State Athletic Commission, after reviewing the testimony and evidence presented on January 16, 1980, that your manager-boxer contract with Joseph M. Scorcia is valid and in force through October 7, 1980.

Gregory did not subsequently seek to have the Commission conduct a formal hearing on this matter, although he was informed he could do so by the Commission.

Instead, on March 13, 1980, Gregory filed the complaint in the instant action.

On March 31, 1980, Gregory scored a TKO over Marvin Johnson and became the light-heavyweight champion of the WBA.

*Scorcia did not breach his duties as Gregory's manager*

■ Plaintiff's first claim is that Scorcia breached his duties to Gregory as his manager by trying to frustrate and by acting in contravention of Gregory's stated desire to fight Johnson on a one-fight basis in early 1980. Plaintiff contends that Scorcia's bad faith and intent to subvert Gregory's will is evidenced by Scorcia's signing the three-option contract on December 31, and by his sending the mailgram to the WBA on January 4 stating that Gregory was not available to fight Johnson at that time. In consequence of these alleged breaches, plaintiff claims to be entitled to have the September 3 and September 10 contracts rescinded.

The evidence does not support Gregory's depiction of Scorcia's actions, but rather demonstrates that Scorcia acted at all times in good faith and in an effort to advance and protect Gregory's interests, under extremely difficult circumstances that Gregory had unjustifiably put him in.

As previously noted, there was a total lack of proof that, prior to December 1979, Scorcia did not use his best efforts to secure remunerative matches for Gregory, or that these efforts did not measure up to the efforts that could reasonably be expected from the "average, prudent, comparable" fight manager. *Bloor v. Falstaff Brewing Corp.*, 454 F.Supp. 258, 267 (S.D.N.Y. 1978), *aff'd*, 601 F.2d 609 (2d Cir. 1979). The record fails to reveal any conduct on Scorcia's part amounting to or even approaching

a material breach of his duties, such as to entitle Gregory to announce, as he did at the December 18 meeting in Cerny's office, that Scorcia was no longer his manager. Scorcia's subsequent actions must be judged in light of the fact that Gregory, having renounced his contract without cause, thereafter refused to cooperate or even communicate with Scorcia.

This Court credits Mr. Scorcia's testimony that he signed the three-option contract and sent the January 4 mailgram at Arum's behest essentially to buy time for his incommunicado client and to protect his ratings, not to thwart his chances at the title. Without any certain means of reaching Gregory (Cerny's office having failed even to return his calls), Scorcia was hardly in any position to know whether these actions would meet with Gregory's approval, and he therefore had to exercise his own judgment as to how best to protect Gregory's interests. There was certainly no harm in his signing the three-option contract in an effort to soothe Arum's impatience, inasmuch as the contract was without legal effect unless and until signed by Gregory. As to the propriety of sending the mailgram, Scorcia double-checked the advice of Arum (who was hardly an uninterested observer) by seeking the counsel of Commissioner Lee, who was both objective and knowledgeable, and who approved Scorcia's action. In these circumstances, Scorcia's actions cannot be held to have been a breach of his duties.

■ Consequently, since Scorcia acted in good faith and did not commit any breach, Gregory is not entitled to have the September 3 or 10 contracts rescinded.[2]

---

**2.** Moreover, even if Scorcia's signing of the contract and sending of the mailgram had constituted a breach of his duties, Gregory would still not be entitled to have the contracts rescinded under the facts of this case. The right of a party to rescind a contract is based on equitable principles, and a party who is in substantial default himself or who has committed the initial breach is not entitled to rescission. *Collins v. Febrey*, 142 Misc. 319, 254 N.Y.S. 450 (Sup.Ct. 1931); 12 *Williston on Contracts*

§ 1468. Gregory, having without justification or equivocation declared that he no longer considered Scorcia his manager, would be the first party in breach. *Commercial Metals Co. v. Int'l Union Marine Corp.*, 294 F.Supp. 570, 572 (S.D.N.Y. 1968); *Restatement of Contracts* § 318(a). Accordingly, Gregory would not be entitled to have the management contracts rescinded on the basis of a subsequent responsive breach by Scorcia.

*Plaintiff is not entitled to have the March 1977 contract declared null and void*

Plaintiff's claim is that the March 1977 contract should be declared null and void because it violates the New York statutes and regulations governing the conduct of boxing in the state. In particular, plaintiff raises two arguments as to why the March 1977 contract is void: (1) it names Flame Gregory Boxing Enterprises as Gregory's manager and thus is said to violate the statute and regulation requiring managers to be licensed by the State Athletic Commission;[3] (2) by seeking to bind Gregory to Scorcia for the four years following termination of the first management contract, it represents an attempt to circumvent the Commission's regulation that no management contract shall have a term of more than four years.[4]

■ The shortcoming in these arguments is that under New York law, a management contract that fails to conform to the statutes and regulations relied on by plaintiff is not perforce invalid for all purposes. Specifically, the statutes and regulations in question have been held to have the limited purpose of regulating the conduct of boxing matches conducted within the State of New York, and not to affect the validity of a management contract insofar as it pertains to boxing matches held outside New York.

Thus, in *Zwirn v. Galento*, 288 N.Y. 428, 43 N.E.2d 474 (1942), the Court of Appeals rejected the argument raised by the boxer Tony Galento that his contract with an unlicensed manager was of no legal effect and did not entitle the manager to one-third of the purse of a fight held in New Jersey. The Court stated:

> It could not have been the intent of the Legislature to prohibit the conduct of the match in New Jersey. Of course, it had no power to do so.
>
> \*      \*      \*      \*      \*      \*
>
> The contract sued upon was not void as contrary to our public policy. It cannot be said that there has been any declaration of public policy with respect to prize fighting outside the statutory enactments . . . Those authorize prize fights and sparring exhibitions. They do not declare contracts with unlicensed managers void, nor were they put into effect to regulate prize fighting outside the State.

288 N.Y. at 432–34, 43 N.E.2d at 476–477.

The March 1977 contract specifically contemplates boxing matches to be held outside of New York, and states that the manager engages the services of the athlete for matches "in the State of New York, England, France, Spain, Germany, Belgium, South Africa, Australia, and all parts of Europe and South America, including United States of America and elsewhere." In the absence of any proof of the law of these various other jurisdictions, the most that this Court would be able to do would be to address the validity of the contract with respect to matches to be held inside New York.[5] However, even as to this issue there is an element of prematurity that leads this Court to conclude that it would be inappropriate for it to exercise its discretion to grant declaratory relief.

3. N.Y. Unconsolidated Laws § 8907 provides, "All corporations, referees, judges, matchmakers, timekeepers, corporation treasurers, box office employees, ticket takers, doormen, ushers, professional boxers, professional wrestlers, their managers, trainers, seconds, announcers and special policemen shall be licensed by the commission."

Plaintiff also attacks the September 3 and September 10 contracts as being void because they purport to make the unlicensed Enterprises the manager of Gregory. As to the September 10 contract, this argument fails simply because the contract names Scorcia personally and in his corporate capacity as Gregory's manager. There is no need to address the validity of the September 3 contract, since it expires prior to the valid September 10 contract.

4. 19 N.Y.C.R.R. § 206.5 provides, "No contract will be approved between a manager and boxer for a term over four years."

5. Plaintiff argues that there has been a change in New York's public policy since the *Zwirn* decision, yet the statutes and regulations currently in force are virtually identical to those in force at the time of the *Zwirn* decision. If there has been a change in New York's policy, that is a matter for the state courts to declare, not this Court.

Under the Commission's regulations, a contract between a boxer and manager is not valid unless it has been approved by the Commission. Consequently, it appears that in order for Scorcia to use the March 1977 contract as a basis for claiming a right to act as Gregory's manager for fights held in New York after October 1980, he will have to receive the Commission's approval of the March 1977 contract. Since the Commission is the body vested by statute "with the sole direction, management, control and jurisdiction over all . . . boxing . . matches· . . . to be conducted, held or given within the state of New York," as well as the sole jurisdiction "over all licenses to any and all persons who participate in such boxing . . . matches," N.Y. Unconsolidated Laws § 8906, this Court is of the opinion that the Commission should have the first opportunity to pass on the validity of the contract under its regulations.

Moreover, since the propriety of granting declaratory relief is measured by general principles of equity, *Eccles v. Peoples Bank*, 333 U.S. 426, 431, 68 S.Ct. 641, 644, 92 L.Ed. 784 (1948), there is another reason why this Court does not feel plaintiff is entitled to have the March 1977 contract declared null and void, even for purposes of New York bouts. As previously mentioned, Gregory received $4,000 and a loan of $6,000 for signing this contract, and this Court considers it improvident to enter into a controversy over the contract's validity prior to at least a tender of this money to defendant Scorcia.

In sum, plaintiff has not demonstrated that under New York law the March 1977 contract is null and void for all purposes, and to the extent that plaintiff has raised a question as to whether the contract complies with the regulations of the Commission, this Court does not choose to exercise its discretion to grant a declaratory judgment on the issue.

*Conclusion*

Plaintiff has failed to demonstrate that he is entitled to have any of the management contracts declared null and void or rescinded. Defendants have shown that they at all times acted in good faith and did not breach their contractual duties to plaintiff. The issues of credibility, which are the nub of this case, are resolved in favor of defendants. The defendants are entitled to judgment dismissing all of the plaintiff's claims, with costs.

The foregoing shall constitute the findings of fact and conclusions of law required by Rule 52(a), Fed.R.Civ.P.

SO ORDERED.