Robert A. HOPPER, Jill S. Schneider, and Thomas P. Tobin, Plaintiffs By Counterclaim,

v.

Ray ADAMS, Ruby Argyro Adams, Ivan T. Flaschner and Decom Medical Waste Systems, Inc., Defendants By Counterclaim.

No. CV–87–281.

United States District Court, E.D. New York.

Aug. 13, 1993.

Winthrop, Stimson, Putnam & Roberts, New York City, for plaintiff and defendants by counterclaim.

Munley, Meade, Burns & Nielsen, P.C., Great Neck, NY, for defendants and plaintiffs by counterclaim.

## MEMORANDUM AND ORDER

DEARIE, District Judge.

Plaintiff KML Laboratories Limited ("KML") has moved, pursuant to Fed. R.Civ.P. 56, for summary judgment on its rescission and breach of contract claims and for dismissal of the counterclaims by defendants Robert A. Hopper, Jill S. Schneider, and Thomas P. Tobin ("Hopper Group"). Defendants have cross-moved for summary judgment against KML, certain KML officials, and an affiliated biomedical waste disposal company, Decom Medical Waste Systems, Inc. ("Adams Group"). For the reasons which follow, the Court grants plaintiff's motion for summary judgment on its rescission claim and plaintiff's motion to dismiss defendants' fraud and fiduciary duty claims. The Court denies defendants' motions.

## BACKGROUND

This action stems from the sale of a biomedical waste disposal company that went awry. Plaintiff KML, an Ontario corporation with its principal place of business in Rexdale, Canada, is one of a related group of companies known as the Argyro Group that owned and operated a large group of medical laboratories in Canada. Defendants Hopper, Schneider, and Tobin ("Hopper Group") were the majority shareholders of Energy Combustion Corporation ("ECC"), a company engaged in the business of transporting and incinerating infectious waste generated by hospitals, laboratories and nursing homes within the New York metropolitan area. ECC maintained its incinerating operations at 311 Winding Road in Old Bethpage, New York.

In June, 1986, after several months of negotiations with the Hopper Group, KML agreed to purchase ECC. The parties entered into a written purchase agreement, dated June 10, 1986, pursuant to which KML was to acquire 100% of the issued and outstanding stock of ECC from the Hopper Group for $2,500,000 to be paid in various installments. The agreement, which specified a closing date of July 10, 1986, contained several representations and warranties made by the Hopper Group including, among others, that ECC's operations were (i) in compliance with all applicable statutes, rules and ordinances, and (ii) that except as otherwise disclosed, no impediments existed—legal or otherwise—to reduce ECC's ability to carry on its waste disposal business as it was then carried out. Agreement at 5(c) and 7(e).

The purchase agreement specifically enumerated the permits ECC held and represented that those permits constituted the only "licenses required to permit the Corporation to carry on its biomedical waste transportation and incineration business." Agreement at 5(a) and (b). The agreement further

stated that "the representations and warranties contained in this agreement shall continue to be true and accurate on the closing date as if made on such date, and shall survive closing." Agreement at 7(e). Significantly, the agreement provided, "If any condition is neither waived nor satisfied, then this agreement shall be null and void and all monies shall be repaid to the Vendee with interest and without deduction." Agreement at 11.

On June 9, 1986, ECC ceased its waste incineration operations pursuant to a consent order between ECC and the New York State Department of Environmental Conservation. The consent order provided that ECC's permits would remain in force until July 10, 1986, but that incineration activity at the site would cease until that date. According to the defendants, ECC chose this date in consideration of the closing date contemplated by the purchase agreement and in light of KML's stated intentions to replace ECC's incinerators.

After being adjourned for various reasons, the closing took place on July 31 and August 1, 1986. The parties closed in escrow, and executed an escrow agreement, dated July 31, 1986, which provided for the release of some funds but conditioned the exchange of additional funds on various events. These events included "approval by the appropriate regulatory agency to construct three incinerator units" on ECC's land and ECC's receipt "of a licence [sic] permitting the transfer of Infectious Waste from one vehicle to another" on ECC premises. (Pl.Exh. 49). The Hopper Group also executed, as required by Paragraph 10(a) of the purchase agreement, a certificate dated July 31, 1986 attesting to the truth, on that date, of the representations contained in the purchase agreement.

Further, at the closing, the parties executed three additional documents: (1) a deposit agreement, by which the Hopper Group deposited the ECC stock with KML's attorney and agreed that KML would be entitled to vote the shares and receive all dividends and distributions; (2) a pledge agreement, by which KML acknowledged its execution of two series of promissory notes; and (3) a

document entitled, "Minutes of Special Meeting of Shareholders" accepting resignations from the Hopper Group and electing four KML individuals to be the new directors of ECC.

As might be expected, things did not go according to plan. On November 6, 1986, the Town of Oyster Bay commenced action against ECC alleging that ECC's operations violated a zoning ordinance prohibiting the incineration of garbage and offal [1] in an "H" zone, the type of zone in which ECC was located. The zoning ordinance at issue had existed throughout ECC's existence, made ECC's incineration of waste at the site illegal, and subjected each of ECC's existing permits to revocation for the failure to comply with local rules and regulations. (Pankoff Dep. 16, 18–20, 48–49; Tobin Dep. 72–78).

On December 24, 1986, KML notified the Hopper Group of its decision to rescind the purchase agreement pursuant to Paragraph 11 of the agreement which, as noted above, provided, "If any condition is neither waived nor satisfied, then this agreement shall be null and void and all monies shall be repaid to the Vendee with interest and without deduction." Agreement at 11. KML demanded the return of the money maintained in the escrow account and all funds advanced to the Hopper Group in connection with the transaction. When the Hopper Group refused KML's demands, KML instituted this action.

## DISCUSSION

### Standard For Summary Judgment

■ Fed.R.Civ.P. 56(c) provides for the granting of summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Rule 56(c) mandates the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden

1. "Offal" is rubbish.

of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2549, 91 L.Ed.2d 265 (1986). Movants may discharge their burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 326, 106 S.Ct. at 2554. The evidence and all factual inferences, however, must be viewed in the light most favorable to the nonmovant. *Beacon Enterprise Inc. v. Menzies,* 715 F.2d 757, 762 (2d Cir.1983).

*Rescission of the Agreement*

■ KML seeks rescission on grounds that the Hopper Group breached its warranties in the purchase agreement that (1) ECC's operations complied with all applicable statutes, rules and ordinances, and (2) that no violations existed that would reduce ECC's ability to carry out its business as it was carried out at the time of the purchase agreement. Defendants have cross-moved for summary judgment dismissing KML's rescission claim. Given the undisputed facts in the record regarding the zoning ordinance's existence and effect (Pankoff Dep. 16, 18–20, 48–49; Tobin Dep. 72–78), no factual issues exist regarding whether the Hopper Group actually breached the warranties in the purchase agreement.[2] This Court need only decide whether rescission is an appropriate remedy here.

■ Viewing the record in the light most favorable to defendants, the Court finds rescission appropriate because defendants' breach, even if innocent, defeated the purpose of the contract. Under New York law[3], a breach in a contract which substantially defeats the purpose of that contract can be grounds for rescission. *See Babylon Associates v. County of Suffolk,* 101 A.D.2d 207, 475 N.Y.S.2d 869 (2d Dept.1984); *Canfield v. Reynolds,* 631 F.2d 169 (2d Cir.1980). Rescission "is not permitted for a slight, casual or technical breach, but, as a general rule, only for such as are material and willful, or,

if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." *Callanan v. Keeseville, A.C. & L.C.R.,* 199 N.Y. 268, 284, 92 N.E. 747, 752 (1910). Moreover, a "[f]ailure to perform in every respect is not essential, but a failure which leaves the subject of the contract substantially different from what was contracted for is sufficient." *Id.*

Although an extraordinary remedy, rescission is appropriate here because the Hopper Group's inability to transfer a viable company constitutes a breach that goes "to the root of the contract." *Direction Associates, Inc. v. Programming & Systems, Inc.,* 412 F.Supp. 714, 719 (S.D.N.Y.1976). *See also National Conversion Corp. v. Cedar Building Corp.,* 23 N.Y.2d 621, 298 N.Y.S.2d 499, 246 N.E.2d 351 (1969) (rescission appropriate when tenant induced to enter lease for use of premises for garbage conversion based upon false representation that premises were in unrestricted zone). KML contracted to purchase a company that was fully licensed and approved to incinerate and transport infectious biomedical waste. The purchase and escrow agreements illustrate KML's preoccupation with insuring that ECC was in compliance with all existing regulations and that the Hopper Group transfer all of the permits necessary for ECC's continued operation. Without doubt, KML intended to purchase a viable company. *See Mallad Construction Corp. v. County Federal Savings and Loan Association,* 32 N.Y.2d 285, 291, 344 N.Y.S.2d 925, 930, 298 N.E.2d 96, 100 (1973) (where parties' intent is "determinable by written agreements, the question [of intent] is one of law" appropriate for resolution on a motion for summary judgment).

The extensive factual record also chronicles KML's preoccupation with operating permits and its protracted efforts to obtain these permits, and establishes beyond doubt that the conveyance of a viable company constituted the fundamental purpose of the

---

**2.** For the purpose of this motion, the Court accepts the defendants' representation that they did not know about the zoning ordinance until they received notice of the Oyster Bay action against ECC. Thus, the Court assumes that defendants' breach was not knowing or willful.

**3.** Plaintiff and defendants agree that New York law applies. *See Klaxon v. Stentor,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Schultz v. Boy Scouts of America, Inc.,* 65 N.Y.2d 189, 197, 491 N.Y.S.2d 90, 95, 480 N.E.2d 679, 684 (1985).

transaction. Indeed, Thomas P. Tobin, a member of the Hopper Group, testified that Ray Adams, KML's principal advisor, was "vastly concerned" that ECC's permits not be cancelled in the period between the contract and closing, (Tobin Dep. 125), and Adams pressed the Hopper Group at the closing in escrow for additional verification regarding the existence and continued existence of ECC's permits. (Tobin Dep. 357; Hopper Dep. 369). Thus, the Court must reject defendants' unsupported contention that KML's real purpose in purchasing ECC was to obtain ECC's goodwill and customer base and not a viable company.

Defendants argue that there is evidence to sustain their claim that plaintiff primarily sought good will and customer access. They point to (1) the noncompetition agreement executed by the parties on July 31, 1986, which refers to "the value of the goodwill of the Corporation" in explaining the need for a liquidated damage provision and (2) a memorandum from the Nassau County Department of Health indicating that county officials advised Ray Adams that Nassau County was reluctant to issue additional emission permits for new incinerators at ECC's site. However, neither this evidence nor any evidence in the record indicates that KML did not intend to purchase a company capable of incinerating at the site, and no genuine issue on this point can be found. Defendants' dramatic charge that KML's purpose "all the way along" was to "get control of the company, get the corporate contracts, client list, everything else they could get from the company, strip it, and then hand us back a bad shell, which they have done, and demand their money back" (Tobin Dep. 362) does not raise a triable issue of fact regarding the object of the contract.

■ Further, the Court must reject defendants' contention that rescission is inappropriate because the pre-contract status quo cannot be restored. Courts generally permit rescission of a contract only when it appears reasonably feasible to return the parties to their respective positions prior to the contract. *See Kamerman v. Curtis,* 285 N.Y. 221, 33 N.E.2d 530 (1941); *E.T.C. Corp. v. Title Guar. & Trust Co.,* 271 N.Y. 124, 2 N.E.2d 284 (1936). Here, the status quo can be restored if the Hopper Group returns to KML the proceeds of the escrow account and the money already released, in exchange for KML's release to the Hopper Group of the shares of ECC stock.

Although defendant argues that these transactions will not restore the status quo because KML mismanaged ECC and this mismanagement eroded customer goodwill during the months prior to KML's learning of the zoning violation, this argument ignores the reality of ECC's condition at the time the parties entered into the purchase agreement. Beset by regulatory difficulties, ECC had ceased incinerating almost two months *before* the closing in escrow pursuant to the consent order with the New York State Department of Environmental Conservation. Moreover, ECC's apparent ignorance of zoning restrictions does not change the fact that, even before the purchase agreement, ECC's past and present incineration activities were illegal and ECC's permits were subject to revocation due to the company's failure to comply with the local rules and regulations. Thus, the fact that rescission may not result in the return of a thriving business to the Hopper Group is of no consequence because plaintiff possesses no obligation to place defendants in a better position than the position in which defendants found themselves prior to the contract.

■ In any event, when rescission is predicated on a breach of contract, the status quo requirement relaxes as the breach becomes more serious. *Jones Chem., Inc. v. City of Binghamton,* 26 A.D.2d 710, 271 N.Y.S.2d 507 (3d Dept.1966), *aff'd,* 20 N.Y.2d 808, 284 N.Y.S.2d 702, 231 N.E.2d 288 (1967); *Duggan v. Platz,* 238 A.D. 197, 264 N.Y.S. 403 (1933), *modified,* 263 N.Y. 505, 189 N.E. 566 (1934). *See also In re Best Films and Video Corp.,* 46 B.R. 861, 876 (Bankr.E.D.N.Y. 1985); *Ballantine v. Ferretti,* 28 N.Y.S.2d 668 (Sup.Ct.1941); *Williams v. Macchio,* 69 Misc.2d 94, 329 N.Y.S.2d 405 (1972). Thus, even if rescission could not restore the status quo here, the fundamental nature of the defendants' breach would warrant rescission.

■ Defendants also seek to avoid rescission by claiming that KML waived its right to rescind by express provision of the purchase agreement. The Court finds no such waiver. Defendants point to Paragraph 5(c) of the purchase agreement, which provides, "The vendee shall have 30 days following the date of execution of this agreement to satisfy itself that the foregoing representations and warranties are true and if the vendee is not so satisfied then this agreement shall be null and void and the deposit shall be returned to the vendee with interest and without deduction." On its face, however, this provision does not preclude KML from insisting on the truth of the Hopper Group's representations and warranties after thirty days from the execution of the purchase agreement nor have defendants presented any evidence to suggest that the parties intended such preclusion. Indeed, such an interpretation would contradict Paragraph 7(c) of the agreement which states without qualification that the representations and warranties in the agreement "shall survive closing."[4]

In any event, defendants' reliance on the thirty-day provision in Paragraph 5 is misplaced because that provision applies only to the **"foregoing** representations and warranties." (emphasis added). Paragraph 7(e), which comes *after* Paragraph 5, provides that no past, present or future violations or litigation would prevent ECC from conducting its business as it was then carried out. Paragraph 11 provides that, "If any condition [contained in the agreement] is neither waived nor satisfied, then this agreement shall be null and void and all monies shall be repaid to the Vendee with interest and without deduction."

■ Further, although defendants contend that KML possessed a duty to "satisfy itself that the representations and warranties were true," (Def.Mem. at 19), a warranty, by definition, constitutes "an assurance by one party to a contract of the existence of a fact upon which the other party may rely." *Metropolitan Coal Co. v. Howard,* 155 F.2d 780,

784 (2d Cir.1946) (L. Hand, J.). Indeed, "it has long been known that if a material state of facts is warranted to exist which turns out not to be the case, the warrantor is liable for the loss or damage caused; and it is no defense that he acted upon misinformation and in good faith." *Pittsburgh Coke & Chemical Company v. Bollo,* 421 F.Supp. 908, 928 (E.D.N.Y.1976), *aff'd,* 560 F.2d 1089 (2d Cir.1977) (citing *Brisbane v. Parsons,* 33 N.Y. 332 (1865)). As the Court of Appeals emphasized in *CBS Inc. v. Ziff–Davis Publishing Co.,* 75 N.Y.2d 496, 554 N.Y.S.2d 449, 553 N.E.2d 997 (1990), "The critical question is not whether the buyer believed in the truth of the warranted information ... but 'whether [it] believed [it] was purchasing the [seller's] promise [as to its truth].'" (citing *Ainger v. Michigan Gen. Corp,* 476 F.Supp. 1209, 1225 (S.D.N.Y.1979)). Since KML possessed no obligation to ascertain the truth of the warranties and representations in the agreements, defendants cannot claim that KML's supposed failure to do so should bar their claim for rescission.

Defendants also contend that, by the agreements executed on July 31, 1986, the parties intended to modify the purchase agreement so that "a failure to perform a 'condition precedent' would result in an adjustment of the purchase price and a concomitant release of dollars and stock shares, not a breach of the purchase agreement." No support for this contention can be found in the parties' agreements or in any of the evidence presented by defendants. Accordingly, the Court rejects this argument and finds that defendants have not raised a triable issue of fact regarding waiver by modification of the agreement.

■ The Court also disposes of defendants' argument that KML, by assuming management of ECC, "assumed the risk" that "certain permits would either never be realized or would take considerable effort to obtain" (Def.Mem. at 22) and, thus, waived its right to insist on satisfaction of the conditions in the escrow agreement pertaining to

4. This contradiction appears clear when one considers that the closing occurred more than thirty days after the parties entered into the purchase agreement. If 5(c) is read to mean that the warranties last only thirty days after the signing of the purchase agreement, then the 7(c) provision that the representations and warranties survive closing is rendered meaningless.

the obtaining of permits. This theory flies in the face of the parties' agreement specifically conditioning the release of the funds from the escrow account on the Hopper Group's ability to obtain certain permits. No evidence in the record suggests that KML, by words or actions, waived any of the warranties or representations in the purchase agreement or any of the conditions in the escrow agreements. Moreover, even if KML knew at closing of potential difficulties ECC faced in obtaining permits for the installation of new incinerators, nothing in the record suggests that KML knew that the zoning ordinance made it illegal for ECC to incinerate waste on its premises. Because KML did not know about the zoning ordinance, KML cannot be held to have waived its right to rescind when the ordinance and its significance became known. *See Beacon Terminal Corp. v. Chemprene, Inc.*, 75 A.D.2d 350, 429 N.Y.S.2d 715 (2d Dept.1980).

■ Finally, the Court rejects defendants' assertion that KML waived its right to rescission by failing to notify defendants of its intention to rescind until December 24, 1986. Clearly, a party wishing to rescind a contract must make this intention known promptly after the discovery of the wrong or defect. *Fink v. Friedman*, 78 Misc.2d 429, 358 N.Y.S.2d 250, 259 (Sup.Ct.1974); *Karson v. Arnow*, 32 Misc.2d 499, 224 N.Y.S.2d 891, 898 (Sup.Ct.1962). Promptly, however, does not mean immediately, but rather within a reasonable time. *Schwartz v. National Computer Corp.*, 42 A.D.2d 123, 345 N.Y.S.2d 579, 581 (1st Dept.1973). Moreover, this requirement must not be interpreted "to create an incentive for parties to litigate before knowing for certain that they have suffered any injury." *Vista Co. v. Columbia Pictures Industries, Inc.*, 725 F.Supp. 1286, 1295 (S.D.N.Y.1989). Here, neither party knew of

the zoning ordinance violation until November 6, 1986 when Oyster Bay commenced its action against ECC. KML solicited legal advice regarding the significance of the zoning ordinance and on December 24, 1986, after receiving communications from the attorney dated December 9, 1986 and December 23, 1986, gave defendants notice of their intention to rescind. Defendants have presented no facts suggesting that KML discovered, or should have discovered, the significance of the zoning ordinance before hearing from their attorney nor have they presented any evidence indicating that this period of approximately six weeks between Oyster Bay's commencement of action and KML's formal notice of rescission constituted an unreasonable amount of time to discover the significance of the ordinance and act upon this discovery. Accordingly, defendants have not raised a triable issue of fact regarding the issue of timely notice.

■ Accordingly, plaintiff's motion for summary judgment on the rescission claim is granted and defendants' cross-motion for summary judgment dismissing KML's rescission claims is denied. The Court also denies defendants' cross-motion for summary judgment on its breach of contract and negotiable instrument claims.[5] Finally, because the Court grants KML rescission, and because rescission is so clearly the only appropriate remedy, the Court will not consider KML's alternative motion for summary judgment on its claim for damages arising from defendants' breach of contract or defendants' motion for summary judgment dismissing those claims.[6]

*Fraud Claim*

■ KML and the Adams Group have moved to dismiss defendants' fraud claim.

---

**5.** According to defendants, KML's "attempted rescission constituted a wrongful repudiation of the purchase and modification agreements." (Def.Mem. at 39). Defendants argue that KML's response to the notice of the zoning violation made "satisfaction of the condition requiring approval of the new incinerators impossible." (Def.Mem. at 40). Generally, a party must perform his or her obligations under a contract before he or she may recover on a breach of contract claim. Here, however, KML's obligations are excused because of the severity of

defendants' breach. *See Fitzgibbons Boiler Co. v. National City Bank*, 287 N.Y. 326, 331, 39 N.E.2d 897, 899 (1942) ("Plaintiff, of course, may not insist on the fulfillment of a contract to which it is a party if it can be said to have brought about the breach of that contract.")

**6.** Of course, the Court has considered these arguments to the extent that they apply to the rescission claim.

The Court grants this motion. In their "Amended Answer with Counterclaims," defendants allege that KML and the counterclaim defendants conspired to undermine and convert ECC's customer base by fraudulently executing the Purchase Agreement without intending to perform. In New York, "an action for fraud will lie if the promisor did not intend to keep his promise at the time he made it." *Hotel Constructors, Inc. v. Seagrave Corp.*, 574 F.Supp. 384, 387 (S.D.N.Y. 1983). *See also Sabo v. Delman*, 3 N.Y.2d 155, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957). Here, however, defendants have produced no facts substantiating their claim of fraud.

Perhaps recognizing this failure, in their papers, the Hopper Group abandons the allegations in the counterclaim, contending now instead that KML and the Hopper Group were "aware [at the time of the attempted closing] that the implementation of its plan to install at least three new incinerators at the old Bethpage site was likely to be significantly delayed and possibly rejected by the regulatory agencies." (Def.Mem. at 34–35). Thus, defendants now argue that KML "knew of such impediments and attempted to cleverly use this knowledge to its advantage, concealing it from the Hopper Group and conditioning the release of escrow upon implementation of its plan." (Def.Mem. at 35). Defendants also contend that "[i]t is reasonable to believe" that KML and the Adams Group also knew that had they informed the defendants of the existence of the regulatory impediments, defendants would not have agreed to condition the release of the funds on permit issuance. (Def.Mem. at 35).

■■■ The elements of common law fraud are "a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." *Katara v. D.E. Jones Commodities*, 835 F.2d 966, 970–971 (2d Cir.

1987). This claim fails because defendants do not contend that KML or the Adams Group made a false representation of fact. (Hopper Dep. 733–737).[7] Rather, defendants base their fraud claim on fraudulent concealment, a cause of action which requires: (1) a relationship between the parties creating a duty to disclose; (2) knowledge of the material facts by the party bound to make the disclosure; (3) nondisclosure by that party; (4) intent to deceive; (5) reliance; and (6) damages. *Dupont v. Brady*, 646 F.Supp. 1067, 1075 (S.D.N.Y.1986), *rev'd on other grounds*, 828 F.2d 75 (2d Cir.1987); *Leasing Service Corp. v. Broetje*, 545 F.Supp. 362, 366 (S.D.N.Y.1982).

■■■ Defendants' fraudulent concealment claim fails because no relationship existed that created a duty to disclose. In negotiations surrounding business transactions, "[a] duty to speak cannot arise simply because two parties may have been on opposite sides of a bargaining table when a deal was struck between them, for under New York law the ancient rule of caveat emptor is still alive and well." *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993), citing *Moser v. Spizzirro*, 31 A.D.2d 537, 537, 295 N.Y.S.2d 188 (2d Dep't 1968), *aff'd*, 25 N.Y.2d 941, 305 N.Y.S.2d 153, 252 N.E.2d 632 (1969). Rather, as the *Brass* Court explained, New York law requires a party to a business transaction to speak only when (1) "the party has made a partial or ambiguous statement," *Junius Constr. Corp. v. Cohen*, 257 N.Y. 393, 400, 178 N.E. 672 (1931), (2) "the parties stand in a fiduciary or confidential relationship with each other," *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991), or (3) "one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Aaron Ferer & Sons Ltd. v. Chase Manhattan*

---

**7.** Moreover, even if defendants could point to a false representation by KML regarding the issuance of the permits, defendants' claim would still fail because, since the regulatory situation was not a matter peculiarly within KML's knowledge, it would not have been reasonable for defendants to rely on KML's statements or opinions regarding the issuance of the permits. *See DiFilippo v. Hidden Ponds Associates*, 146 A.D.2d

737, 738, 537 N.Y.S.2d 222, 224 (2d Dept.1989); *Most v. Monti*, 91 A.D.2d 606, 606, 456 N.Y.S.2d 427, 428 (2d Dept.1982). Ironically, in the portion of their papers dealing with KML's fraud claim, defendants contend that KML's fraud claim is precluded because *both* parties possessed ample access to information regarding ECC's regulatory situation.

*Bank, N.A.,* 731 F.2d 112, 123 (2d Cir.1984). *Brass,* 987 F.2d at 150.

Defendants contend that KML and its principals possessed a duty to disclose the regulatory impediments because they knew that defendants would be injured by their silence. This curious argument, unsupported by evidence, fails in any event because the information that defendants claim KML concealed from them was readily available to defendants. *See Heineman v. S. & S. Machinery Corp.,* 750 F.Supp. 1179, 1186 (E.D.N.Y.1990); *Aaron Ferer & Sons,* 731 F.2d at 123; *Young v. Keith,* 112 A.D.2d 625, 627, 492 N.Y.S.2d 489, 490–91 (3d Dept.1985). Regulatory pressures on ECC and related difficulties were no secret. (Hopper Dep. 630; Tobin Dep. 117, 229). As the owners and managers of ECC, defendants regularly interacted with regulatory officials and knew all about ECC's regulatory history and the corporation's strained community relations. Indeed, according to defendants, the knowledge that KML purportedly acquired about the regulatory impediments came, not from some secret source available only to KML, but from discussions with state and county regulatory officials.

■ Defendants also maintain that KML possessed a duty to disclose because a fiduciary relationship existed between the parties at the time they entered into the escrow agreements. The Court disagrees. According to defendants, since the escrow agreements transferred "management of the corporation" to KML, the "acceptance of the management role created a fiduciary relationship wherein KML and the Adams Group, in managing the corporation, owed a fiduciary duty" to defendants. (Def.Mem. at 37–38). However, even if the escrow agreements ultimately transformed KML and the Adams Group into fiduciaries of the corporation, the parties' relationship at the time they entered into the agreements was merely that of buyer and seller.

The record establishes that, as buyer and seller, they engaged in a mutually beneficial, arms-length commercial transaction. Under New York law, "a conventional business relationship, without more, does not become a fiduciary relationship by mere allegation." *Oursler v. Women's Interart Center, Inc.,* 170 A.D.2d 407, 566 N.Y.S.2d 295, 297 (1st Dept.1991). Further, when "parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." *National Westminster Bank v. Ross,* 130 B.R. 656, 679 (Bankr.S.D.N.Y. 1991). Defendants have failed to produce any evidence that the parties' dealings were not at arms-length or that extraordinary circumstances giving rise to a fiduciary duty existed at the time the parties entered into the escrow agreements. *See also Compania Sud–Americana de Vapores v. IBJ Schroder,* 785 F.Supp. 411, 425–426 (S.D.N.Y.1992). Thus, defendants fail in their attempts to base a duty to disclose on the existence of a fiduciary relationship between the parties at the time they entered into the escrow agreements. Accordingly, defendants' fraud claim must be dismissed.[8]

### Breach of Fiduciary Duty Claim

■ Defendants seek summary judgment on the second count of their amended counterclaim which alleges that KML and Ruby Argyro Adams, as director of KML, breached a fiduciary duty owed to defendants. Defendants maintain that after the transaction closed in escrow, KML assumed complete control of ECC and this control created "the same trust relation toward other stockholders that a corporation usually bears to its stockholders." According to defendants, KML mismanaged the corporation and this mismanagement constituted a breach of the fiduciary duty owed to defendants as "fellow shareholders of ECC." KML and Ruby Adams have moved to dismiss this claim, contending that no fiduciary relationship existed and that, even if such a relationship did exist, defendants' conclusory allegations of mismanagement fail to substantiate their claim of breach of fiduciary duty. The Court agrees. Even assuming the existence of a fiduciary relationship, defendants' claim fails.

---

**8.** In light of the Court's dismissal of defendants' fraud claim, the Court does not address whether the fraud claim against Ivan Flaschner must also be dismissed for lack of in personam jurisdiction.

*See Kamin v. American Express Company,* 86 Misc.2d 809, 815, 383 N.Y.S.2d 807, 812 (Sup.Ct.1976), *aff'd,* 54 A.D.2d 654, 387 N.Y.S.2d 993 (1st Dept.1976).

Defendants cite six instances of purported "mismanagement" which, according to defendants, "led to the demise of a once flourishing business." (Def.Mem. at 28, 30). Defendants complain that "KML purchased or leased unnecessarily lavish office space," that KML could have saved money by incinerating waste on Long Island rather than transporting it to Quebec, that KML failed to provide ECC's customers with sufficient trailers to transport waste, and that KML should have utilized outside services to make pick-ups from hospitals. (Def.Mem. at 28). In addition, defendants charge that KML delayed its submission of an application for a Consumer Affairs permit, and remarkably they take issue with KML's decision to advise ECC's customers to use competitor firms following notice of the zoning violation. (Def.Mem. at 29).

However, even if defendants could establish that these decisions were unwise or imprudent, errors in judgment alone do not constitute a breach of fiduciary duty. "If a director exercises his business judgment in good faith on the information before him, he may not be called to account through the judicial process, even though he may have erred in his judgment." *Rous v. Carlisle,* 261 A.D. 432, 434, 26 N.Y.S.2d 197, 200 (1st Dept.1941), *aff'd* 290 N.Y. 869, 50 N.E.2d 250 (1943). If KML acted in good faith and in the exercise of honest judgment, as the available evidence surely indicates, defendants cannot now complain simply because they believe that, in retrospect, other courses of action would have been more prudent than the ones taken.[9]

To prevent dismissal, defendants must come forward with some evidence tending to show that KML's actions were so opposed to the true interests of the corporation as to raise an inference that the actions were taken other than in the proper exercise of judgment in corporate affairs. *Greenbaum v. American Metal Climax, Inc.,* 27 A.D.2d 225, 228, 278 N.Y.S.2d 123, 127 (1st Dept.1967). Defendants have failed to make this showing. The record reveals ample justifications for each of the business decisions challenged by defendants. Moreover, the descriptions of KML's activities and the after-the-fact critiques of KML's management decisions contained in the affidavits of Dennis Gunstone, a site supervisor at ECC, and Camille Fiume, an executive secretary and office manager for ECC, do not suffice. Although Mr. Gunstone opines that KML "intended to alienate ECC from its customers and divert the customers to other competing businesses at a greater cost to the customers," his affidavit does not explain the factual basis for this curious conclusion nor does any support for this contention appear anywhere in the record. (See Hopper Dep. 615–618). Although defendants' papers reflect similar allegations regarding KML's motives in entering into the transaction and in assuming control over ECC, defendants have produced no facts in support of their theories. Neither their speculation about KML's motives nor their criticism of KML's actions raises any inference or reveals any triable issue of fact sufficient to sustain defendants' claim. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*Defendants' Remaining Motions*

KML has agreed to dismiss its fraud claims if its motion for summary judgment is granted. Accordingly, the Court need not consider defendants' motion to dismiss these claims.

### CONCLUSION

For the foregoing reasons, the Court grants plaintiff's motion for summary judgment on its rescission claim. Accordingly, the Court orders that the Hopper Group return to KML the proceeds of the escrow account and any funds already released in exchange for KML's release to the Hopper Group of the shares of ECC stock. Further,

---

9. In their papers, defendants seem to recognize that the purported "mismanagement" was not accompanied by bad faith. At one point, they state, "After closing, KML took over management of ECC. Through a series of unfortunate acts and omissions by KML and the Adams Group, ECC was rendered valueless." (Def.Mem. at 40).

the Court dismisses defendants' fraud claim, fiduciary duty claim, and breach of contract and negotiable instrument claims.

SO ORDERED.