UNITED STATES POSTAL
SERVICE, Plaintiff,

v.

PHELPS DODGE REFINING COR-
PORATION and Phelps Dodge
Corporation, Defendants.

No. 92 CV 3855 (JG).

United States District Court,
E.D. New York.

Jan. 2, 1997.

Zachary W. Carter, United States Attorney, Eastern District of New York, Brooklyn, New York by Stanley N. Alpert, Jennifer C. Boal, and Charles S. Kleinberg, Assistant United States Attorneys, for Plaintiff.

Daniel M. Abuhoff, Harry Zirlin, and Stuart Hammer, Debevoise & Plimpton, New York City, for Defendants.

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

GLEESON, District Judge:

### INTRODUCTION

The United States Postal Service (the "Postal Service") has sued Phelps Dodge Refining Corporation ("Phelps Dodge") and its parent, the Phelps Dodge Corporation, alleging that defendants have breached an agreement for the sale of real property located in Maspeth, New York. Specifically, the Postal Service claims that Phelps Dodge breached an obligation to excavate lead- and cadmium-containing soil on the property that was the subject of a remedial action plan approved by the New York State Department of Environmental Conservation (the "DEC"). Plaintiff also claims that the agreement was based on a mutual mistake of fact that went to the heart of the bargain. In addition, plaintiff alleges that Phelps Dodge breached an obligation to remove all asbestos-containing materials from the property and to obtain a release of the City of New York's interest in portions of the property. Plaintiff seeks rescission of the contract of sale or, in the alternative, reformation of the contract's indemnification provision and damages for Phelps Dodge's breach.

A bench trial was held from June 7–20, 1995, and summations were held on July 13, 1995. In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, this Court makes the following Findings of Fact and Conclusions of Law. For the reasons set forth below, the contract of sale is rescinded. Phelps Dodge is ordered to return the $14,740,000 that was paid for the property. In addition, interest must be paid on that sum from August 13, 1992, the day the complaint was filed, at the rate of 9 percent per annum.

### FINDINGS OF FACT

#### The Agreement

1. The property that is the subject of this case is known as "Laurel Hill," and is referred to herein as the "site," the "property" or the "Phelps Dodge site." It consists of approximately 37 acres in a heavily industrialized area of Maspeth, Queens. The property is under and slightly east of the Kosciusko Bridge, on the Queens side of the Newtown and Maspeth Creeks, which comprise one body of water that runs east-west under the bridge. The creeks flow into the East River and are subject to its tidal influences.

2. The site was occupied by industrial users for more than 100 years. As early as 1875, a sulfuric acid plant was in operation there. In 1888, a copper refining plant and "phosphate works" was operated there on landfill placed between the Long Island Railroad tracks, which run east-west through the property, and the bulkhead along Newtown Creek. Ore and copper smelting were conducted there (in coal-fired furnaces until 1920, when the conversion to oil was made), as well as the repackaging of bulk acids that were apparently produced on the site. Phelps Dodge purchased the property in the late 1920s. It expanded and rebuilt the smelting plant and added, by 1939, a tin plant, a silver refinery and a nickel refinery. Phelps Dodge also built a copper sulphate plant, which produced copper sulfate and copper sulfate-based pesticides. Phelps Dodge ceased its operations on the property in 1983. Its activities produced hazardous wastes and introduced various contaminants into the soil and groundwater at the site, including lead and cadmium.

3. In 1985, the United States Postal Service considered purchasing the site for use as a mail processing plant. It retained a con-

sulting firm, Sverdrup–Gilbane, which reported after a site evaluation that soil samples in the "footprint" area of the site, *i.e.*, where the rectangular building would be constructed, exceeded the test limits for lead and cadmium. Sverdrup–Gilbane further reported that the extent of the contamination could not fully be defined without additional studies. A May 1985 report by Sverdrup–Gilbane provided a preliminary estimate that 15,000 cubic yards of contaminated soil (with a "hauling" volume of 16,500 cubic yards) would have to be excavated from the site, at a cost of approximately $3.9 million.

4. The Postal Service gave Sverdrup–Gilbane's report to Phelps Dodge and suggested that Phelps Dodge conduct further studies and work with the New York State Department of Environmental Conservation ("DEC") to design a plan to remediate the hazardous wastes.

5. In March 1986, Phelps Dodge's environmental consultant, Fred C. Hart Associates ("Hart"), issued a report that reflected Hart's study of the site. The report set forth several options for the remediation of wastes on the site, including excavation (with off-site removal of the excavated material) and an impermeable cap of concrete or asphalt over the contaminated soil. Hart recommended a cap. The DEC, however, criticized Hart's study and recommendation in May 1986 because of, among other things, insufficiencies in the data upon which it was based. The DEC further suggested that a cap might be inconsistent with future construction on the site. Penetrating the cap in the course of construction would expose the workers to hazardous soil and create airborne particles as well. The DEC recommended more testing, using proper protocols, before a best available solution could be determined.

6. The 1985 negotiations between Phelps Dodge and the Postal Service regarding the purchase of the site broke down. James T. Coe, Director of the Postal Service's Office of Real Estate, commenced a new round of negotiations with Phelps Dodge during the summer of 1986. On July 30, 1986, the Board of Directors of Phelps Dodge's parent company, the Phelps Dodge Corporation, approved the sale of the Phelps Dodge site to the Postal Service.

7. On August 13, 1986, Phelps Dodge and the Postal Service executed an Option and Contract for sale of the Phelps Dodge site (the "Option and Contract") for a purchase price of $14,640,000. (Plaintiff's Exhibit ("PX") 34). The Postal Service wanted the site available for the construction of a General Mail Facility ("GMF") for Queens, New York. A GMF is a mail processing and distribution center. The Postal Service communicated its planned use for the site to Phelps Dodge and informed Phelps Dodge that it was necessary to remove any contamination from the footprint of the proposed Postal Service building. Phelps Dodge needed and received the details of the Postal Service's planned construction in order to propose a remedial plan that would be approved by the DEC.

8. The Option and Contract, at § 2.01(a), provided that, of the purchase price:

TWO MILLION SIX HUNDRED SIXTY–TWO THOUSAND TWO HUNDRED ($2,662,200.00) DOLLARS [shall be paid] at the time of execution and delivery of this Contract, by check of the United States Treasury, drawn on a Federal Reserve Bank to the order of the Title Company, as Escrow Agent ("Escrow Agent"), who shall hold and disburse the proceeds of said check ("Option Payment"), and interest earned thereon, in accordance with the provisions of an agreement between Seller, Purchaser and said Escrow Agent ("Escrow Agreement") . . .

9. The Option and Contract, at § 2.02, provided:

In the event Purchaser shall default in the performance of its obligations to (i) purchase the Premises in accordance with the provisions hereof, or (ii) make all payments to Seller required hereunder, Seller, as Seller's sole remedy, shall have the right to receive from Escrow Agent the Option Payment and all interest and other sums earned on the Option Payment as liquidated damages for all loss, damage and expense suffered by Seller, including, without limitation, the loss of its bargain. . . .

10. The Option and Contract, at § 16, provided:

It is understood and agreed by the parties hereto that Purchaser agrees to purchase the Premises provided that the Board of Governors of Purchaser grants approval of the purchase of the Property at its meeting to be held on September 8th and 9th, 1986.... In the event such approval shall be granted and such notice be served by September 16, 1986, the service of said notice shall be deemed the exercise by Purchaser of the option to purchase the Premises, this Option Agreement shall become a binding agreement for purchase and sale, and in that event (i) the Purchase Price set forth in § 2.01 shall be increased by ONE HUNDRED THOUSAND ($100,-000.00) DOLLARS from FOURTEEN MILLION SIX HUNDRED FORTY THOUSAND ($14,640,000.00) DOLLARS TO FOURTEEN MILLION SEVEN HUNDRED FORTY THOUSAND ($14,-740,000.00) DOLLARS....

11. The Option and Contract, at § 14.01, provided:

Neither this Contract nor any provisions hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

12. The Option and Contract, at § 18.01, provided:

Purchaser has been advised that Seller has filed a remedial plan (the "Remedial Plan") with the DEC requesting the approval thereof and that negotiations are now pending between representatives of Seller and of the DEC with references to modifications of the Remedial Plan acceptable to the DEC and to Seller. Seller agrees to proceed with its application with reasonable diligence and continuity so that the final Remedial Plan may be approved without delay. Upon receiving final approval or acceptance of, or equivalent indication of the approval of the Remedial Plan (any one of which being referred to herein as the "approval"), Seller shall forward notice to Purchaser that Seller has received approval of the Remedial Plan ("Notice of Approval") and simultaneously therewith shall forward to Purchaser copies of (i) proof of approval, (ii) the approved Remedial Plan and (iii) a cost estimate ("Cost Estimate") from any one of the following three Contractors as to the cost of performing all work required to comply with such Remedial Plan....

The three contractors listed in Section 18.01 were reviewed by the Postal Service prior to the execution of the Option and Contract to ensure that they were qualified to excavate and remove contaminated soil in a proper manner.

13. The "Remedial Plan" referred to in the Option and Contract was the March 1986 report by Hart. It advocated that remediation of the site be accomplished by a cap over the contaminated areas.

14. The Option and Contract, at § 18.01, further provided:

Purchaser shall have the option to require Seller to perform all work to comply with the approved Remedial Plan after the Closing provided Purchaser shall, within seven (7) business days after the service of the Notice of Approval forward notice to Seller to that effect. If Purchaser shall exercise said option, title shall nevertheless close, ... and Seller shall commence such work promptly and perform the same with reasonable diligence and continuity to completion after the Closing.

Pursuant to this section, $750,000 of the purchase price was placed in escrow to secure Phelps Dodge's performance of the remediation.[1] This $750,000 was to be turned over to Phelps Dodge, with interest, upon its performance of "all work required to comply with the approved Remedial Plan."

15. The Option and Contract, at § 18.04, provided:

Contract provided for a sale "on an 'as is' basis", see Defendants' Post–Trial Proposed Findings of Fact and Conclusions of Law, ¶ 15, is frivolous.

1. In view of this and other contractual obligations related to the remediation of the site, Phelps Dodge's assertion that the Option and

Seller shall, at its sole cost and expense, indemnify, hold harmless and defend Purchaser, for a period of four (4) years from the Closing against any and all future actions by regulatory bodies and/or other third parties regarding any type of Waste situate upon or within the Property attributed to Seller during the period of its ownership . . .

The purpose of this indemnification provision was to protect the Postal Service from additional hazardous waste issues that might arise during a reasonable period after remediation and the construction of a new facility on the site.

16. At the time the parties entered into the Option and Contract, the Postal Service believed that excavation would be required, at least in the footprint of its proposed building. There were multiple reasons for this belief. First, excavation was necessary to enable later construction by the Postal Service. In order to construct its proposed building, the Postal Service needed to be able to drive pile caps and install underground storage tanks, utility and sewer lines. Performing these functions through contaminated soil might create a contamination pathway into the groundwater. Second, excavation was necessary in order to satisfy the unions that represent postal workers, which had previously expressed objections to contamination at other Postal Service buildings and had expressed specific concerns regarding the Phelps Dodge site. Third, the DEC's strong criticism of the March 1986 report by Hart, which had recommended a capping remedy, warranted a reasonable belief on the part of the Postal Service that the only form of remediation that would be accepted by the DEC would be excavation.

17. At the time of the execution of the Option and Contract, both Phelps Dodge and the Postal Service understood that the remediation contemplated by the Option and Contract would, in all likelihood, consist of excavation of the contaminated soil and off-site removal. Bull Durham, who at the time was the Chairman of the Board of the Phelps Dodge Corporation, informed Mr. Coe shortly before the execution of the Option and Contract that updated estimates from Phelps Dodge's environmental consultant showed excavation could be accomplished for approximately $750,000. Mr. Durham stated that excavated soil would be disposed of in Ohio. In addition, an internal Phelps Dodge document concerning the proposed sale forecast an expense for the lead and cadmium cleanup of $750,000 to $1,500,000, an estimate that was consistent with remediation by excavation and off-site removal.

18. The Option and Contract, as noted, explicitly recognized that negotiations between Phelps Dodge and the DEC regarding remediation were ongoing. If those negotiations had produced an approved plan that did not require excavation of contaminated soil, the Postal Service would not have gone forward with the purchase of the property.

19. On October 1, 1986, the DEC issued a letter that established removal criteria for the lead and cadmium on the site. The letter required a remedial action plan to be submitted to the DEC for review and approval prior to the initiation of any remedial action.

20. In response to the DEC's October 1, 1986, letter, on October 23, 1986, Hart submitted to the DEC a Remedial Action Plan ("RAP") (PX 45), which required excavation of lead- and cadmium-contaminated soil. The RAP gave a "rough estimate" that 4,450 cubic yards of soil required removal and acknowledged the difficulty in predicting the scope of the necessary excavation. Phelps Dodge represented to the Postal Service that it had arrived at the 4,450 estimate by using a "surgical" approach for the removal of "hot spots" of contaminated soil.

21. By letter dated November 26, 1986, the DEC approved the October 23, 1986 RAP requiring excavation of lead- and cadmium-contaminated soil, followed by filling with clean soil and capping with asphalt. The approval was conditioned on the incorporation of the RAP into an Order on Consent executed by the DEC and Phelps Dodge.

22. On December 9, 1986, Phelps Dodge received a bid from Associated Chemical and Environmental Services ("ACES") for excavation, removal and disposal of the lead- and cadmium-contaminated soil at the Phelps Dodge Site, followed by filling with clean soil

and asphalt capping of the excavated areas, at a cost of $1,968,500. The bid was based on the assumption that 6,440 cubic yards of soil would be removed. The bid provided unit prices for additional payments if more excavation was required.

23. Also on December 9, 1986, Phelps Dodge formally notified the Postal Service that the RAP had been approved by the DEC, as required by the Option and Contract. If the plan had not been approved, the contract for the sale of the property would not have closed. Had the approved plan not required excavation of the contaminated soil, and instead permitted a form of remediation that would not permit future construction, the Postal Service would have refused to close and would have forfeited the $2,662,200 option payment.

24. On December 17, 1986, the Postal Service exercised its option under the Option and Contract to require Phelps Dodge to perform the approved RAP. If the Postal Service had opted to assume that obligation, it would have received a purchase price reduction in the amount of the bid, or $1,968,-500. The Postal Service elected to delegate the performance of the RAP to Phelps Dodge in order to avoid the contingent liabilities associated with the remediation.

25. The RAP, at 1–4, provided:

NYSDEC issued a letter, dated October 1, 1986, that established certain requirements for the remedial action. The letter established removal criteria for the lead and cadmium. The removal limit for the lead was identified to be 10 ppm or greater, as determined by the EP Toxicity Test procedure and that for cadmium was identified to be 1 ppm or greater, as determined by the EP Toxicity Test procedure.

The removal limit of 10 parts per million for lead was a negotiated level, as the legal standard at the time for lead was 5 parts per million, and Hart had advocated using 20 ppm.

26. The RAP, at 2–9, provided:

The specifications will define an initial quantity of contaminated soil to be excavated and will establish a mechanism for measurement and payment if additional soil must be excavated.

27. The RAP, at 2–11 and 2–13, provided:

This work requires that the SRC [Soil Removal Contractor] (1) excavate the soil defined in Tasks 2 and 3 and (2) dispose of it in a RCRA approved hazardous waste facility ... The SRC will be responsible for excavating all the contaminated soil up to the limits set in Task 3.

28. The RAP, at 2–14, provided:

Task 5: Conduct Sampling and Perform Additional Excavation

This work consists of (1) sampling the remaining soils and analyzing the samples for lead and cadmium; (2) evaluating the samples with respect to NYSDEC limits established for this project; and (3) performing additional soil excavation, if necessary.

29. The RAP required additional testing outward and downward to further define contaminated areas and continued excavation and removal of contaminated soil in these areas.

30. The Postal Service was satisfied with the RAP despite its lack of specificity regarding the scope of excavation of contaminated areas because the method adopted assured that the contamination would be fully excavated, at least in the footprint of the building, and construction would therefore be possible.

31. The RAP estimated that Phelps Dodge's excavation work at the Phelps Dodge Site would take sixteen weeks from start to finish. Representatives of the Postal Service believed that the sixteen-week estimate was optimistic and expected completion in six months to a year. Phelps Dodge expected the job to be completed by approximately the end of July 1987. The Postal Service required completion of the remediation during 1987 in order to construct the GMF within the time frame established by the four-year indemnification provision in the Option and Contract. Had the Postal Service believed at the closing that performance of the RAP would take substantially longer than one year, it would not have closed.

32. On December 30, 1986, the Postal Service and Phelps Dodge executed an Agreement that amended the Option and Contract (Plaintiff's Exhibit ("PX") 59). The Agreement, at ¶ 3, provided:

Under the provisions of § 18.01, Purchaser has required Seller to commence promptly and perform all work to comply with the approved Remedial Plan, as defined in § 18.01, with reasonable diligence and continuity to completion after the closing of title under the Contract.

33. The "approved Remedial Plan" referred to in the December 30, 1986 Agreement was the October 23, 1986 RAP. The parties' agreement mandated the performance by Phelps Dodge of that plan, which required the excavation of the contaminated soil.

34. Phelps Dodge contends that, under the contract[2] between the parties, the performance of the RAP will occur when a final report is approved by the DEC, even if the method of remediation is something other than the excavation and removal of contaminated materials. According to Phelps Dodge, the Postal Service has no contractual right to excavation; rather, its rights in this regard were limited to determining which party would perform remediation. I explicitly reject this construction of the contract as inconsistent with the terms of the Option and Contract, as amended by the December 30, 1986 Agreement, and with the understanding and intentions of Phelps Dodge and the Postal Service when the latter agreement was executed.

35. Phelps Dodge was obligated by its contract with the Postal Service to remove the contaminated soil, to continue digging outward and testing to define the limits of contamination, to fill the excavated areas with clean soil and to cover them with asphalt. Phelps Dodge did not reserve the right to perform some form of remediation other than that contained in the RAP. The parties did not delegate to the DEC the authority to amend the obligations in the contract between Phelps Dodge and the Postal Service. Performance of the RAP, which was incorporated into the contract between Phelps Dodge and the Postal Service, was required. On December 30, 1986, both parties expected that performance of the RAP would result in the site being removed from the DEC's hazardous waste list.

36. The December 30, 1986 Agreement, at ¶ 4, provided:

In lieu of the retention by the Escrow Agent, as defined in the Contract, of (a) the sum of $500,000.00 as provided in § 17.02 and (b) the sum of $750,000.00 as provided in § 18.01, it is agreed that the sum of $2,000,000.00 shall be retained by said Escrow Agent to secure performance by Seller of its obligations under said § 17.02 and § 18.01 . . .

The escrow amount was thus increased to $2 million to cover, in part, the performance of the RAP.

37. At the time of closing, the Postal Service intended to have the site available for its Queens GMF.

38. An Order on Consent between Phelps Dodge and the DEC was entered on February 11, 1987. The Order on Consent incorporated the RAP and required Phelps Dodge to perform it.

*The Remediation*

39. In March 1987, ACES began its excavation work on the Phelps Dodge site pursuant to its contract with Phelps Dodge. The Postal Service hired Sverdrup–Gilbane to oversee the performance of the RAP by Phelps Dodge. Excavation proceeded at the Phelps Dodge site in accordance with the contract until July 1987, when, during the process of excavation, ACES encountered groundwater. ACES did some further excavation at groundwater level and removed some water off-site.

40. During the attempted performance of the RAP in 1987, several unanticipated events occurred. Phelps Dodge encountered underground obstructions and buried structures. In addition, although Phelps Dodge

---

**2.** The Option and Contract, as amended by the December 30, 1986 Agreement, are referred to herein collectively as the "contract."

expected that the removal of two feet of soil (all above the water table) would be sufficient, the excavation hit groundwater, as noted above. Continued excavation at the water level caused the wet excavation sidewalls to cave in. The unanticipated contamination of the water table raised additional concerns about the migration of contaminants off the site, including into Newtown and Maspeth Creeks.

41. After the excavation hit groundwater, Phelps Dodge estimated that continued excavation across the entire 35 acres of the site could cost as much as $27–30 million, and it decided to stop excavating. It did so unilaterally in August 1987, citing the need to determine the scope of additional necessary excavation by implementation of a soil boring program. Although Phelps Dodge stated that excavation would resume in three weeks, it did not, and excavation has never resumed.

42. From March to August 1987, ACES had excavated and removed approximately 10,000–12,000 cubic yards of contaminated soil and concrete. Between October 15 and October 26, 1987, Hart, at Phelps Dodge's direction, took 112 soil borings and tested those borings for lead and cadmium. The soil boring program was intended to delineate the outward perimeter of required excavation, as the DEC had previously directed, and was considered by Phelps Dodge and the DEC to be a prerequisite to the completion of the remediation. Hart provided its soil boring report to Phelps Dodge in December of 1987. It concluded that it would cost Phelps Dodge an approximately $1.9 million to complete the excavation work required under the RAP.

43. If Phelps Dodge were to continue today to excavate all of the contamination as required by the RAP, it would have to remove approximately 450,000 cubic yards of material at a cost of approximately $275,000,-000. These estimates are inherently suspect, as the vagaries of groundwater contamination render the future cost of any remediation effort especially difficult to predict.

44. Phelps Dodge breached its obligation to complete the RAP. It did so because it concluded that the additional work it would require was too expensive. Phelps Dodge delayed any further remediation efforts. Its conduct after 1987 was designed to avoid the expense of the remediation it had promised to accomplish and to wait out the four-year indemnification provision in its contract with the Postal Service.

45. During 1988 and into 1989, Phelps Dodge wrangled with the DEC over testing procedures and whether groundwater monitoring was necessary. No progress was made at the site. Then, on April 26, 1989, Phelps Dodge wrote to the DEC that the RAP was "inconsistent with Requisite Technology (as that term is defined in the [Order on Consent])," and that soil stabilization or another *in-situ* remedy was appropriate and would be analyzed in a remedial investigation/feasibility study ("RI/FS"). Phelps Dodge further proposed to submit a Supplemental Remedial Program, which would set forth a plan for groundwater and surface water investigations that would provide the data for the RI/FS.

46. On June 7, 1989, the DEC agreed that the RAP was inconsistent with requisite technology and advised Phelps Dodge that the Order on Consent should be modified.

47. Coe wrote to Phelps Dodge on June 29, 1989, expressing satisfaction that the remediation work would be reactivated on the site. He expressed support for the remediation amendment so that work could "begin in earnest to complete appropriate cleanup measures." (PX 442.) Defendants make much of this letter, asserting that it evidences the Postal Service's understanding that Phelps Dodge could use any form of remediation approved by the DEC. I find otherwise. The Postal Service regarded the groundwater monitoring that Phelps Dodge agreed to perform (which required DEC approval) as a necessary step toward the recommencement of the excavation required by the RAP. For that reason alone, the Postal Service supported the recent efforts of Phelps Dodge to get the remediation project on track. The June 29, 1989 letter from Coe (1) did not evidence or constitute a waiver of the Postal Service's contractual right to the excavation of contaminated soil required by the RAP; (2) was not intended to be such a

waiver; (3) was not perceived as such a waiver by Phelps Dodge; and (4) could not reasonably have been so perceived by Phelps Dodge.

48. By no later than mid–1989, and possibly as much as two years earlier, Phelps Dodge had in fact decided that there would be no continued excavation. This decision was not communicated to the Postal Service. Rather, the Postal Service was under the impression, which was fostered by Phelps Dodge, that the groundwater monitoring proposed in 1989 was a necessary step toward resuming excavation. Indeed, the Supplementary Remedial Program submitted to the DEC by Phelps Dodge on November 20, 1989, which proposed, *inter alia*, an extensive groundwater investigation of a year's duration, contemplated a Focused Feasibility Study (*i.e.*, the RI/FS referred to above) that would evaluate continued remediation pursuant to the RAP.

49. The investigation, however, consumed nearly three years. Phelps Dodge simply strung out the process, availing itself of the delays inherent in the DEC's administrative processes and creating additional delays by replacing groundwater consulting firms and conducting additional rounds of testing before finally issuing its Focused Feasibility Study in July of 1992.

50. Phelps Dodge's goal during this period was at least two-fold. First, having assumed the obligation to defend and indemnify the Postal Service with respect to environmental-related liabilities for a period of four years (until December 30, 1990), it wanted to delay any use of the site by the Postal Service during that period. Such use, and construction in particular, would pose a substantial risk of regulatory or other legal action based on the contaminants on the site. Thus, in an August 11, 1989, internal memorandum, Henry Konerko, the president of Phelps Dodge, described his current plan to "use up [the] four year indemnification period." (PX 312 at 22.)[3]

Second, Phelps Dodge hoped eventually to gain DEC approval of a remediation alternative (*i.e.*, capping) other than the one it agreed to accomplish.

51. On July 15, 1992, Phelps Dodge finally submitted its Focused Feasibility Study to the DEC. The Focused Feasibility Study included an estimate of 29,000 cubic yards of additional contamination, and Phelps Dodge sought the DEC'S permission to leave the contaminated soil on site under a clay or asphalt cap. The proposed cap would have covered areas in and around the initial "hot spots" identified in the RAP, without further testing outward and downward to define the limits of contamination. Phelps Dodge never defined the limits of contamination as required by the RAP. The proposed cap would cost an estimated $840,000 to $905,000.

52. The Focused Feasibility Study rejected the continuation of excavation required in the RAP and estimated that completion of that remedy would cost $26,525,000. Its recommendation included 30 years of groundwater monitoring, institutional controls and deed restrictions, which would make it difficult, if not impossible, to construct a building on the site. The cap would shift the potential liability for the hazardous waste from Phelps Dodge to the Postal Service. Phelps Dodge recommended the cap because it would be quick, easy and inexpensive to implement.

53. The Focused Feasibility Study was the official and public culmination of Phelps Dodge's approach to the remediation of the site. It was a definitive public statement of the position that it had reached years earlier: it would not remediate the site pursuant to the RAP. The Postal Service promptly commenced this action, filing the complaint on August 13, 1992.

54. Phelps Dodge thereafter endeavored to convince the DEC that a capping remedy was appropriate. The DEC expressed concerns over the future use of the site if a cap were placed over the contaminated soil and

---

**3.** This and several other documents that tend to undermine Phelps Dodge's position have disappeared without a satisfactory explanation. They were neither produced nor identified on a privilege list. But for an attorney's summary of most of them (*see* PX 309 and PX 312), the evidence would have disappeared entirely, and one document (the map appended to the original Order on Consent) has not been retrieved in any form.

groundwater. On January 27, 1994, the DEC issued a Proposed Remedial Action Plan ("PRAP") under the Order on Consent, which tentatively adopted Phelps Dodge's proposed capping plan for a portion of the Phelps Dodge site identified as Operable Unit One. The remainder of the Phelps Dodge site was not addressed in the PRAP. The PRAP further stated that the capping remedy would include deed restrictions on the site to eliminate the potential for disturbance of the soil.

55. On February 24, 1994, a public hearing on the PRAP was conducted by the DEC. Local politicians and members of the Maspeth, Queens community objected to the capping remedy. The Postal Service, which had vigorously opposed the proposal embodied in the PRAP since June of 1993, vehemently objected to it at the public hearing as well.

56. In May 1994, the New York City Department of Environmental Protection issued a report (the "City report") identifying contaminants on the site that were not addressed in the Focused Feasibility Study. The study was conducted in connection with a possible purchase of the Phelps Dodge site for use as a sewage sludge processing facility. The City no longer intends to purchase the property.

57. On July 7, 1994, the DEC notified Phelps Dodge that the DEC would not go forward with the PRAP. The DEC provided to Phelps Dodge a copy of the City report and invited Phelps Dodge to discuss alternatives for the site after viewing the report.

58. Phelps Dodge has not attempted to discuss other alternatives and has not done anything to fulfill its remediation obligation since July 1994.

59. Phelps Dodge's refusal to complete the 1986 RAP or any other remediation plan has essentially prohibited the Postal Service from using or selling the site and has severely and materially affected the economic value of the site to the Postal Service.

60. A cap over the contaminated soil would substantially limit future use of the site. Wholly apart from the dubious feasibility (from an engineering standpoint) of building in the area of the cap, it is unlikely that the DEC would permit a developer to do so. Even before it received new data and withdrew its preliminary approval of the cap, the DEC had made it clear (in the PRAP) that it would not permit building through the cap. Indeed, the preliminary (and since withdrawn) approval of the capping remedy included a requirement that, along with capping, there would be "[d]eed restrictions to eliminate soil disturbance." The Postal Service's planned facility would require driving four or five hundred piles to depths of 70 to 80 feet, precisely the sort of soil disturbance the DEC would likely prohibit. Even if such construction were approved, any developer of the site would risk significant additional costs during construction because of the possibility of disturbing contaminated soil.

61. In addition, a capping remedy, if approved, would require 30 years of groundwater monitoring. It would also likely prevent the rezoning of the site from a heavy manufacturing zone. This would further damage the marketability of the site to "big box" retailers, to whom an owner might rent the property if the contaminated soil were removed from the buildable portion of the site.

62. Heavy metals are present in relatively high concentrations throughout the site in surface soil below existing slabs and foundations. Metals of particular concern are arsenic, lead, copper, cadmium, mercury and zinc. Soils throughout the site have failed toxicity analysis for lead, cadmium, and mercury and would therefore be considered hazardous waste if excavated and disposed of off-site.

63. If the 1986 RAP had been completed, it would have resulted in the entire fill layer being removed across the entire site and in the removal of all of the other contaminants that are being discharged into the adjoining creek each year.

*The Removal of Asbestos*

64. Both before and after the execution of the Option and Contract in August 1986, Phelps Dodge told the Postal Service that it was removing all asbestos from the Phelps Dodge site. At least as early as August 1, 1986, Phelps Dodge engaged a contractor to remove the asbestos. On the day of the

closing of the December 30, 1986 Agreement, Phelps Dodge failed to bring the asbestos-removal certificates. Phelps Dodge represented that the asbestos had been removed and promised to provide the certificates after the closing. This promise was memorialized in writing, but not in the December 30, 1986 Agreement; rather, it was the subject of a letter agreement endorsed by M.S. Bell, Phelps Dodge's then–President. (PX 60.)

65. As it turned out, the certificates stated that only friable asbestos had been removed. This was contrary to the representations made prior to the closing by Phelps Dodge, upon which the Postal Service relied in going forward with the execution of the December 30, 1986 Agreement.

66. In July 1990, the Postal Service notified Phelps Dodge that there was additional asbestos on the site. The asbestos was not observed by the Postal Service until then because in the intervening years, its employees and agents had spent very little time at the site. Especially during the long periods when no excavation was underway, there had been little reason for Postal Service representatives to be on the site. The discovery was made in July 1990 pursuant to an environmental inspection by the Postal Service in anticipation of the expiration of the four-year indemnification provision on December 30, 1990.

67. Upon being informed of asbestos on the site, Konerko agreed to correct the problem immediately. Konerko and Coe presented conflicting versions of their 1990 communications. Konerko says Phelps Dodge agreed only to remove some bags of asbestos that were found lying around the site. Coe says that Konerko agreed to remove all asbestos at the site, including asbestos in the buildings, thus acknowledging that Phelps Dodge had assumed that obligation in 1986 (or in early January 1987). I credit Coe's testimony in this and all other respects.

68. Although Phelps Dodge promised to remove asbestos from the property, a great deal of asbestos remains. The cost of removing the remaining asbestos from the site would be approximately $10 million.

*The Clearing Of Title*

69. The parties were aware in 1986 that there was a problem in transferring good title to the entire property: New York City has a title claim to part of it. In the December 30, 1986 Agreement, Phelps Dodge agreed to clear that problem by causing New York City to release its title claim.

70. Phelps Dodge's efforts to procure that result have failed, largely due to the seemingly intractable environmental problems on the property.[4]

### CONCLUSIONS OF LAW

This Court has jurisdiction over the case pursuant to 28 U.S.C. §§ 1339 and 1345, as well a pursuant to 39 U.S.C. § 409(a).

### A. *Material Breach of Contract*

■ Under New York law, which the parties agree is applicable, a breach of a contract can be grounds for rescission. The drastic remedy of rescission is not available for minor or technical breaches; rather, it may be obtained only for breaches that are material and willful, or, if not willful, so substantial or fundamental as to strongly tend to defeat the object of the contract. *K.M.L. Laboratories Ltd. v. Hopper,* 830 F.Supp. 159, 163 (E.D.N.Y.1993) (citing *Callanan v. Keeseville, Ausable Chasm and Lake Champlain Railroad Co.,* 199 N.Y. 268, 284, 92 N.E. 747, 751–52 (1910)).

■ Phelps Dodge breached its contract with the Postal Service by failing to perform the RAP (which required excavation and removal of contaminated soil, filling the holes with clean soil and then capping with asphalt) with diligence and continuity to completion. Phelps Dodge breached the contract by repudiating the responsibilities set forth in the RAP and assumed by Phelps Dodge in its contract with the Postal Service. Phelps Dodge breached its contract by failing to complete the RAP and deliver a buildable and marketable site within a reasonable time

---

4. The Court reserved decision on objections to portions of deposition testimony (of Konerko, Coe, Bell and the Postal Service's Edward Wandelt) offered by plaintiff. The defendants' objections in this regard are overruled.

after commencing the RAP. *See Callanan,* 199 N.Y. at 284, 92 N.E. at 752; *United States v. Summit General Contracting Corp.,* 760 F.Supp. 1004, 1012 (E.D.N.Y.1991); *Freeman v. Ralph Realty Corp.,* 198 A.D. 788, 191 N.Y.S. 72 (1st Dep't 1921).

The Postal Service contends, and I find, that the parties intended to bind Phelps Dodge to the excavation plan in the RAP, even though the DEC might eventually permit a different remedial program. Phelps Dodge derides this position as unreasonable and suggests that it may even be illegal. Defendants' Post–Trial Proposed Findings of Fact and Conclusions of Law, at 54 (citing *Natwest USA Credit Corp. v. Alco Standard Corp.,* 858 F.Supp. 401, 413 (S.D.N.Y.1994), and *Nassau Chapter, Civil Service Employees Ass'n v. County of Nassau,* 77 A.D.2d 563, 564, 430 N.Y.S.2d 98, 100 (2d Dep't 1980), *aff'd* 54 N.Y.2d 925, 445 N.Y.S.2d 152, 429 N.E.2d 831 (1981)). Phelps Dodge's argument is without merit. The Postal Service reasonably sought to (and did in fact) bind Phelps Dodge to the excavation remedy contained in the RAP because other remedies, especially capping, would most likely defeat the very purpose of the site acquisition by the Postal Service. A party is free to secure by contract a form of environmental remediation that may differ from less onerous efforts that regulatory authorities may eventually permit. That is what the Postal Service did here.

In essence, Phelps Dodge contends that its contractual obligation to Phelps Dodge to remediate the property by excavation is subject to change. It argues that, since contracting parties are charged with constructive knowledge of environmental laws, *see Mardan Corp. v. C.G.C. Music, Ltd.,* 804 F.2d 1454, 1463 (9th Cir.1986), and the law in force at the time the contract is executed becomes part of the agreement, *id.* (citing *State ex rel. Abrams v. Solil Management Corp.,* 128 Misc.2d 767, 491 N.Y.S.2d 243 (Sup.Ct.N.Y.Co.) *aff'd,* 114 A.D.2d 1057, 495 N.Y.S.2d 161 (1st Dep't 1985)), the Postal Service bargained for any form of remedia-

tion that the DEC might approve in the regulatory process that attends an amendment to the Order on Consent. Thus, according to Phelps Dodge, if it can persuade the DEC to approve a different form of remediation than the excavation required by the RAP, then Phelps Dodge may fulfill its obligation to the Postal Service by performing the amended remediation plan, even if the end result is property that cannot be used by the Postal Service for its intended purpose. I reject this argument because the contract called for the remediation required by the RAP. That obligation is set forth explicitly in the December 30, 1986 Agreement and, furthermore, is consistent with the intent of both parties when that Agreement was executed.

■ Moreover, even if I were to accept Phelps Dodge's description of its obligations to the Postal Service I would conclude that a material breach has occurred and rescission is appropriate. Phelps Dodge has failed to achieve *any* approved remediation of the site, and no such remediation is in sight. Ironically, although Phelps Dodge had failed to remediate the property for nearly nine years (as of the time of trial), it now blames the Postal Service for that failure. Defendants Post–Trial Proposed Findings of Fact and Conclusions of Law, at 57; Trial Transcript at 1557–59. It complains that the Postal Service objected to the 1994 Proposed Remedial Action Plan, which would have allowed a capping remedy if approved. Phelps Dodge contends that the resulting withdrawal of the PRAP by the DEC accounts for Phelps Dodge's failure to remediate. This argument borders on disingenuous. On the one hand, Phelps Dodge contends that the parties made the DEC the ultimate arbiter of Phelps Dodge's remediation obligations under the contract; on the other, it claims that it was inappropriate for the Postal Service to communicate with the DEC on that very subject.[5] It further claims that having done so, the Postal Service cannot now assert that the contract has been breached. In fact, Phelps

5. Phelps Dodge even asserted a counterclaim against the Postal Service based on these events, alleging that the Postal Service tortiously interfered with Phelps Dodge's "contract" with the DEC. This claim was dismissed on summary judgment by Judge Weinstein. (Transcript of proceedings dated October 7, 1993, at 23–24.)

Dodge has not fulfilled even its own interpretation of its contractual obligations because it has chosen not to, and it has engaged in dilatory tactics ever since it became clear that there may well be no solution to the environmental problems affecting the Phelps Dodge site. Thus, even were I to accept Phelps Dodge's own characterization of its obligation to the Postal Service, I would conclude that those obligations have been breached as well, and that the breach is sufficiently material to the bargain to warrant rescission.

### B. Mutual Mistake Of Fact

 Rescission is also appropriate on the alternative ground of a mutual mistake of fact. Mutual mistake supports a cause of action for reformation or rescission. See Matter of Gould v. Board of Education, 81 N.Y.2d 446, 453, 599 N.Y.S.2d 787, 791, 616 N.E.2d 142, 146 (1993). The mistake must be so fundamental that it defeats the object of the contract. Callanan, 199 N.Y. at 284, 92 N.E. at 752; Clanton v. Smith, 170 A.D.2d 643, 567 N.Y.S.2d 67 (2d Dep't), app. denied, 78 N.Y.2d 852, 573 N.Y.S.2d 466, 577 N.E.2d 1058 (1991). In real property transactions, rescission for mutual mistake may generally be granted where the status quo is restorable. D'Antoni v. Goff, 52 A.D.2d 973, 383 N.Y.S.2d 117 (3d Dep't 1976); Copland v. Nathaniel, 164 Misc.2d 507, 511, 624 N.Y.S.2d 514, 518 (Sup.Ct. Westchester Co.1995). Especially where, as here, (1) a mistake produces a practical inability to perform a contract; (2) the resulting nonperformance is so substantial and fundamental as to defeat the parties' object in contracting; and (3) damages cannot be ascertained with reasonable certainty, rescission is the appropriate remedy. Callanan, 199 N.Y. at 284, 92 N.E. at 752.

██ Phelps Dodge contends that the facts here cannot support a finding of a mutual mistake of fact because both parties were aware of the environmental contamination and of the uncertainties associated with remediation. It relies on cases that hold that the knowing assumption by a party of a certain risk precludes it from claiming mistake if the risk materializes. See Defen-

dant's Post–Trial Proposed Findings of Fact and Conclusions of Law at 50–52. Those cases, however, do not preclude a finding of mutual mistake on the facts of this case. The contract here specifically allocated to Phelps Dodge the responsibility to remediate the property by excavation. When that specific obligation was assumed, neither party knew or could reasonably have been expected to anticipate that unacceptable levels of lead and cadmium would continue to be present even after the excavation reached the groundwater.

This is not a case in which the purchaser of real property executed a release of all claims arising out of the sale, see Mardan Corp. v. C.G.C. Music, Ltd., 804 F.2d 1454 (9th Cir. 1986), or remained "consciously ignorant" of a discoverable environmental hazard. See Vandervort v. Higginbotham, 222 A.D.2d 831, 832, 634 N.Y.S.2d 800, 801 (3d Dep't 1995). Rather, the contract here allocated to the seller, Phelps Dodge, the responsibility to perform all work to comply with the RAP with reasonable diligence and continuity to completion. See Commander Oil Corp. v. Advance Food Service Equipment, 991 F.2d 49, 54 (2d Cir.1993) (distinguishing Mardan, supra, by noting that the "broad indemnification language" in the Mardan contract "was not compromised by any specific language allocating environmental responsibility").

Konerko himself, the central witness for Phelps Dodge, testified about the mistakes of fact that went to the core of the agreement between the parties. When it assumed the remediation obligation, Phelps Dodge planned to dig out a two-foot depth of dry, contaminated soil over part of the property and to haul that soil away. The depth of the required excavation was unanticipated, as was the fact that the backhoes would reach the groundwater before extracting all the contaminated soil. Hitting the groundwater drastically altered the character of the remediation obligation. It not only made excavation more difficult (e.g., as the soil was removed, the muddy side walls would cave in and fill up the hole), but it implicated an array of virtually insoluble problems, including the pumping and treating of contaminated groundwater, the monitoring of the effects

of tidal influences in the Newtown and Maspeth Creeks on the movement of contaminants off the site, and the prospect of long-term groundwater monitoring requirements. These and other concerns rendered the prospect of continued excavation, in the words of Konerko, "ludicrous." In the context of this case, the parties' mistaken belief that remediation by excavation was feasible is no different than a mistaken belief in the boundaries of the property itself. *See Larsen v. Potter*, 174 A.D.2d 801, 571 N.Y.S.2d 121 (3d Dep't 1991).[6] Under these circumstances, plaintiff may appropriately seek rescission of the conveyance, which places the parties back in the same position they were in prior to the contract for sale.

Phelps Dodge and the Postal Service were mutually mistaken as to the extent of contamination on the site, the amount of time it would take to remove it, the feasibility of (1) providing a buildable site to the Postal Service in 1987; (2) the feasibility of completing the RAP; and (3) completing the excavation under the RAP without encountering groundwater. Rescission is the appropriate remedy for these material mutual mistakes. *Larsen v. Potter*, 174 A.D.2d 801, 571 N.Y.S.2d 121 (3d Dep't 1991); *D'Antoni v. Goff*, 52 A.D.2d 973, 383 N.Y.S.2d 117 (3d Dep't 1976); *Kel Kim Corp. v. Central Markets, Inc.*, 70 N.Y.2d 900, 524 N.Y.S.2d 384, 519 N.E.2d 295 (1987).[7]

### C. *The Alleged Waiver Of The Right To Seek Rescission*

 Phelps Dodge claims that the Postal Service may not obtain rescission because it waited too long to seek it. The argument relies heavily on Judge Newman's decision in *Gannett Co. v. Register Publishing Co.*, 428 F.Supp. 818, 824–26 (D.Conn.1977), which describes a significant time limitation on an injured party's option to rescind a contract once the factual basis for doing so is discovered. However, the limitation at issue in *Gannett* applies to actions to rescind contracts induced by fraud, and *Gannett* explicitly distinguished actions for rescission based on other grounds, such as unreasonable delay in performance. *Id.* at 824 n. 7 (citing *Richard v. Credit Suisse*, 242 N.Y. 346, 152 N.E. 110 (1926)).

*Richard* is one of two decisions written by Justice Cardozo for the New York Court of Appeals that establish this distinction. Two years before *Richard*, in *Schenck v. State Line Telephone Co.*, 238 N.Y. 308, 144 N.E. 592 (1924), the court addressed an action to rescind a contract for the sale of real property on the ground that the plaintiff was fraudulently induced to sell the property. The plaintiff sought rescission 12 years after the sale. Although the court affirmed the Appellate Division's reversal of judgment on the pleadings in favor of the defendant, it reiterated that "rescission to be effective must be announced without unreasonable delay." 238 N.Y. at 313, 144 N.E. at 594.

Whereas the plaintiff in *Schenck* sought rescission for fraud, the plaintiffs in *Richard* sought rescission for nonperformance. In *Richard*, Justice Cardozo explained the difference. Rescission for fraud is based on the theory that there was never mutual assent. Such a claim must be asserted promptly upon discovery of the fraud (although exceptions will be made depending upon the effect of any lapse in time, *see* 242 N.Y. at 351, 152 N.E. at 111) or the injured party will be deemed to have ratified the bargain. However, when rescission is sought based on nonperformance, there is no such absence of assent, and "notice may be given at any time within the period of the statute of limitations unless delay would be inequitable. Such inequity will result, for instance, if there is

---

6. Phelps Dodge asserts that the Postal Service, acting through Coe, was not surprised that excavation had encountered groundwater. However, the cited testimony reveals that Coe, who could not recall whether he was surprised at the news, had understood that the inability to complete excavation had been unanticipated. On this issue—the availability of excavation as a realistic form of remediation—both parties were plainly mistaken.

7. Because I conclude that rescission is appropriate on the alternative grounds of material breach and mutual mistake of fact, I do not reach the plaintiff's proposed conclusions of law relating to Phelps Dodge's failures to remove asbestos and to clear title.

property to be returned, or if reliance upon apparent acquiescence will result in hardship or oppression." *Id.* (citations omitted). If, as occurred here, a defendant has promised performance within a reasonable time, the plaintiff is under no duty to rescind when it first discovers that performance has been unreasonably delayed. It might postpone its decision to seek rescission "until [its] patience was exhausted by aggravation of the wrong ... Rescission is not barred because indulgence has been shown." *Id.* (citations omitted).

Thus, although Phelps Dodge relies on several cases that stress the requirement that actions seeking rescission must be initiated without unreasonable delay, those involving rescission for fraud are of little assistance to Phelps Dodge. *See Allen v. West Point–Pepperell, Inc.,* 945 F.2d 40 (2d Cir.1991); *Spyder Enterprises, Inc. v. Ward,* 872 F.Supp. 8 (E.D.N.Y.1995); *Banque Arabe v. Maryland Nat. Bank,* 850 F.Supp. 1199 (S.D.N.Y.1994) *aff'd,* 57 F.3d 146 (2d Cir. 1995).

It is nevertheless true that a party seeking rescission for mistake or nonperformance may not *unreasonably* delay the making of such a claim. *K.M.L. Laboratories, Ltd.,* 830 F.Supp. at 166. On the other hand, there is no requirement that the injured party commence legal proceedings immediately, and the law should not create an incentive to do so. *Id.* (citing *Vista Co. v. Columbia Pictures Industries, Inc.,* 725 F.Supp. 1286, 1295 (S.D.N.Y.1989)). In assessing the reasonableness of a delay, the focus should be on the justifications provided for it and on the inequities, if any, that it has produced. *See Richard,* 242 N.Y. at 351, 152 N.E. at 111.

There was no unreasonable delay here. The Postal Service waited for Phelps Dodge to remediate the site. In 1989, when groundwater monitoring was proposed by Phelps Dodge, the Postal Service went along with the idea. In 1992, when the Focused Feasibility Study made it unmistakably clear that Phelps Dodge had repudiated its obligation to remediate by excavation, the Postal Service promptly brought this action. Although the government's "indulgence" (*see Richard,* 242 N.Y. at 352, 152 N.E. at 111–12) might well be characterized as benign neglect of an

extremely important real estate contract, it does not bar rescission because that remedy causes no inequity to Phelps Dodge. On December 30, 1986, it obligated itself to remove contaminants from the property. It was given ample time to perform that obligation, but it failed to do so. Indeed, it has obviously abandoned any intention of so doing. Now it must take back the property that is still laced with a number of contaminants. As Judge Weinstein observed in denying Phelps Dodge's motion to dismiss, it is "difficult to weep" for Phelps Dodge because it "put the stuff in the ground to begin with." There was no unreasonable delay by the Postal Service in seeking rescission, and there is no unfairness to Phelps Dodge in granting it.

### D. Prejudgment Interest

■ Under New York law, "in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion." N.Y.C.P.L.R. § 5001(a). An action to rescind a contract is an action of an equitable nature. *Matsushita Electric Corp. of America v. Gottlieb,* 90–CV–3010(CES), 1991 WL 152615, *8 (S.D.N.Y. Aug. 1, 1991) (citing *Gregory v. Scorcia,* 493 F.Supp. 984, 989 (S.D.N.Y. 1980)). Thus, the award of prejudgment interest to the Postal Service is within the discretion of this Court. *See Spyder Enterprises, Inc. v. Ward,* 872 F.Supp. 8 (E.D.N.Y. 1995).

In exercising this discretion, courts should consider the rationale underlying an award of prejudgment interest, *i.e.,* that the plaintiff be compensated for being deprived of the use of its money. *Woodling v. Garrett Corp.,* 813 F.2d 543, 561 (2d Cir.1987). Public policy favors the award of interest in equity actions, and it should generally be awarded unless equitable principles or general consideration of fairness suggest otherwise. *See generally* J. Weinstein, H. Korn & A. Miller, *New York Civil Practice* ¶ 5001.06 (1996).

The Postal Service paid $14,740,000 for the property on December 30, 1986. I conclude that it would be unfair to Phelps Dodge to award prejudgment interest from that date on the funds it must now return. The Postal

Service waited passively, for nearly six years, for Phelps Dodge to fulfill its remediation obligation at the site, and during that period Phelps Dodge incurred significant costs. On balance, I conclude that interest should run from August 13, 1992, the date the Postal Service filed its complaint in this case seeking rescission. *See Pearlstein v. Scudder & German*, 346 F.Supp. 443, 454 (S.D.N.Y.1972) (awarding prejudgment interest from the date the lawsuit was commenced because that was first date on which plaintiff clearly demanded rescission).

I conclude that the amount of interest should be the nine percent provided for by CPLR § 5004. This is not mandatory; courts have the discretion to adjust the amount of interest. *See* J. Weinstein *et al., supra,* ¶ 5001.06 at 50–22 (where statutory rate is lower than market rate, courts have awarded higher rates); *see also Septembertide Publishing, B.V. v. Stein and Day, Inc.*, 884 F.2d 675, 683–84 (2d Cir.1989) (upholding a preverdict interest award of five percent); *Arnold Herstand & Co., Inc. v. Gallery: Gertrude Stein, Inc.*, N.Y.L.J., January 21, 1993 at 25 (Sup.Ct.N.Y.Co.) ("As interest rates have been extremely low in the relevant period, a charge for the use of the money is meaningless"), *rev'd on other grounds*, 211 A.D.2d 77, 626 N.Y.S.2d 74 (1st Dep't 1995). Taking into account all of the circumstances in this case, including general considerations of fairness, I conclude that the equitable rate of interest is the 9 percent set forth in CPLR § 5004.

## CONCLUSION

The Clerk is directed to enter judgment for the plaintiff. It shall rescind the Option and Contract dated August 13, 1986 and the December 30, 1986 Agreement and give judgment in favor of the United States Postal Service in the amount of $14,740,000, plus interest at the rate of nine percent per annum commencing on August 13, 1992.

So Ordered.